FILED IN OFFICE
JUL 30 2010
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

WITOLD NETER,        )
                             )
        **Plaintiff**        )
                             )
**vs.**                   )
                           )
**MOLD & HOTRUNNER**  )
**TECHNOLOGY AG,**     )
                           )
        **Defendant.**    )

**CIVIL ACTION FILE**

**NUMBER** _2010CV188970_

## VERIFIED COMPLAINT FOR DAMAGES

**COMES NOW** the Plaintiff by and through his legal counsel of record and files this his Complaint against the Defendant and shows the Court as follows:

1.

Plaintiff is an individual residing in the State of Georgia and has previously entered into a written agreement with the Defendant, Mold & Hotrunner Technology AG, with regard to certain proprietary and intellectual property of the Plaintiff.

2.

The Defendant Mold & Hotrunner Technology AG ("MHT"), a German company, has submitted itself to the jurisdiction of this Court pursuant to the agreement by and between Plaintiff and Defendant.

3.

A true and correct copy of the agreement by and between Plaintiff and Defendant is attached hereto as Exhibit "A", and by reference incorporated herein, which agreement is hereinafter sometimes referred to as the "MHT Agreement".



- 1 -

4.

The Defendant is a German corporation and has engaged in activities in the State of Georgia, and has agreed, pursuant to the MHT Agreement that it is subject to the jurisdiction of this Court and may be served by second original pursuant to O.C.G.A. § 9-11-4(F)(3) and applicable statutes as referenced therein at its principal place of business in Germany.

5.

The Defendant has consented, pursuant to the terms of the MHT Agreement, to venue in this Court.

6.

Pursuant to the terms and conditions of the MHT Agreement, Defendant agreed to license, on certain terms and conditions, intellectual property created by Plaintiff to include patents registered in Plaintiff's name so long as Defendant abided by the terms of the MHT Agreement.

7.

Defendant breached the terms and conditions of the MHT Agreement by failing to make payment to the Plaintiff on a timely basis as required pursuant to the terms and conditions of the MHT Agreement.

8.

Plaintiff terminated the MHT Agreement for cause, as allowed pursuant to the terms and conditions of MHT Agreement.

9.

Subsequent to the termination of the MHT Agreement the Defendant remained liable for payment of commissions to the Plaintiff for the periods ending December 31, 2008 and June 30, 2009.

10.

Subsequent to the termination of MHT Agreement for cause due to the breach by Defendant, the Defendant made payment of the commission amounts due for the periods ending December 31, 2008 and June 30, 2009 and failed to make any further commission payments to Plaintiff.

11.

Subsequent to the termination of the MHT Agreement due to breach by Defendant, the Defendant continued to be liable and responsible for payment of the commissions to the Plaintiff for a period thereafter to run for three (3) years.

12.

Pursuant to the MHT Agreement, Defendant was to account to Plaintiff, for its total gross sales, at the end of each six month period of each calendar year, and remit to Plaintiff the sum of four tenths of one percent (0.4%) of all gross sales of Defendant which had occurred in the preceding six (6) month accounting period, with payment to be made within thirty (30) of said accounting.

13.

The Defendant has made no accounting to the Plaintiff for the period ending December 31, 2009 and has made no payment of the commission for use of Plaintiff's intellectual property for the period ending December 31, 2009.

- 3 -

14.

Pursuant to the terms and conditions of the MHT Agreement, Defendant was required to cease the use of all of the Plaintiff's intellectual property upon termination of the MHT Agreement for cause.

15.

Upon information and belief, Defendant continues to make use of and to avail itself of the intellectual property of the Plaintiff in violation of the terms and conditions of the MHT Agreement.

**COUNT ONE**
**Retention And Use Of Confidential**
**And Proprietary Information**

16.

Plaintiff does hereby reassert and reallege the allegations set forth in Paragraphs 1 through 15 of his Complaint and incorporates said paragraphs by reference as if fully set forth herein.

17.

The Defendant is in possession, and has control over the proprietary and confidential information of the Plaintiff as described and set forth in the MHT Agreement, which it no longer has a right to use.

18.

The proprietary and confidential information of Plaintiff as described in the MHT Agreement is confidential, proprietary and valuable information belonging to the Plaintiff.

- 4 -

19.

The Plaintiff has demanded that the Defendant cease the use of his proprietary and confidential information which Defendant has refused to do.

20.

Unless the Defendant is required to cease all use of the Plaintiff's proprietary and confidential information Plaintiff will be irreparably harmed and has no adequate remedy at law.

**COUNT TWO**
**Accounting**

21.

Plaintiff does hereby reassert and reallege the allegations set forth in Paragraphs 1 through 20 of his Complaint and incorporates said paragraphs by reference as if fully set forth herein.

22.

The MHT Agreement requires an accounting be provided to Plaintiff for each six (6) month calendar period of each year in which a commission remains due to Plaintiff following the termination of the MHT Agreement for cause.

23.

The Defendant has failed and refused to deliver an accounting to the Plaintiff.

24.

Plaintiff is entitled to receive an accounting from the Defendant for all gross sales of the Defendant for the period ending December 31, 2009.

25.

The Plaintiff is entitled to receive future accountings from the Defendant for the six (6) month periods ending June 30, 2010, December 31, 2010, June 30, 2011 and December 31, 2011 and June 30, 2012.

## COUNT THREE
**Payment of Commission**

26.

Plaintiff does hereby reassert and reallege the allegations set forth in Paragraphs 1 through 25 of his Complaint and incorporates said paragraphs by reference as if fully set forth herein.

27.

The Plaintiff is entitled to a commission of four tenths of one percent (0.4%) of the gross sales of the Defendant for the use of his proprietary and confidential information for the period ending December 31, 2009.

28.

The Plaintiff shall be entitled to a commission of four tenths of one percent (0.4%) going forward on the gross sales of the Defendant through and including June 30, 2012.

**WHEREFORE,** Plaintiff prays that judgment be entered in his favor and against the Defendant as follows:

(a)     That the Defendant be compelled to provide an accounting for the gross sales of the Defendant for the period ending December 31, 2009 and be further compelled to provide an accounting of its gross sales for the periods in the future ending June 30, 2010, December 31, 2010, June 30, 2011 and December 31, 2011 and June 30, 2012;

- 6 -

(b)     Money damages in an amount equal to four tenths of one percent (0.4%) of the gross sales of Defendant for the six (6) month period ended December 31, 2009 and each six month period thereafter concluding with the six month period of June 30, 2012; and

(c)     For such other and further relief as this Court deems just and proper.

This ___30___ day of ___July___, 2010.

Respectfully submitted,

Jackson L. Culbreth
Georgia Bar No. 200300

115 Perimeter Center Place
Suite 900
Atlanta, Georgia  30346
(678) 252-6300

Attorney for Plaintiff Witold Neter

- 7 -

# EXHIBIT "A"

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement"), dated as of **January 26, 2007**, is by and between **MOLD & HOTRUNNER TECHNOLOGY AG** ("Company") and **WITOLD NETER**, a resident of Georgia with a residence of 62 Shadow Lake Trail, Newnan, Georgia, USA 30265 (the "Employee").

### RECITALS:

WHEREAS, the Company and the Employee have previously entered into an employment agreement and an accompanying non-solicitation and confidentiality agreement as well as an employee invention agreement, all of them dated August 1, 2005, and

WHEREAS, both the Company and the Employee desire to enter into a new employment agreement whereby the Company shall engage and retain Employee as an employee of the Company in accordance with the terms of this Agreement, and Employee desires to accept such employment on such terms;

NOW, THEREFORE, in consideration of the mutual promises, terms, covenants and conditions set forth herein and the performance of each, it is hereby agreed as follows:

### AGREEMENTS:

1. <u>Termination of Prior Employment Agreement</u>. The Employment Agreement including the accompanying non-solicitation and confidentiality agreement (the "Non-Solicitation and Confidentiality Agreement") and the employee invention agreement (the "Employee Invention Agreement") by and between the Company and the Employee, all of them dated August 1, 2005. The Employment Agreement is hereby terminated and is null, void and of no further effect, while the Non-Solicitation and Confidentiality Agreement as well as the Employee Invention Agreement shall remain in effect as set forth in Paragraph 4 below.

2. <u>Employment and Duties</u>. (a) The Company hereby employs Employee as:

   (i)   Director for Technical Strategy;

   (ii)   a Chief Technical Officer for MHT USA, LLC., a wholly-owned subsidiary of the Company ("MHT USA"); and

   (iii)   in such other capacities as may be assigned by the Company. Employee will report to the President of the Company or such other person with managerial responsibility for the operations of the Company. The Employee shall devote the Employee's best efforts and all of the Employee's business time and attention to the business and affairs of the Company and MHT USA and shall diligently, faithfully and competently perform the Employee's duties and responsibilities hereunder.

## EXHIBIT "A"

Notwithstanding anything herein to the contrary, for MHT USA, the Employee shall have no authority, directly or indirectly, to approve, authorize or otherwise effect any of the actions set forth on Exhibit A attached hereto and made a part hereof without the specific approval of the Board, as and which such Exhibit A may be amended by the Board from time to time. Employee hereby accepts this employment upon the terms and conditions herein contained and agrees to devote Employee's time, attention and best efforts to promote and further the business of the Company.

    (iv)   Employee shall faithfully adhere to, execute and fulfill policies established by the Company which do not violate the laws of the jurisdiction where performed.

    (v)   Employee shall not, during the term of Employee's employment hereunder, be engaged in any business activity pursued for gain, profit or other pecuniary advantage if such activity interferes with Employee's duties and responsibilities hereunder. However, the foregoing limitations shall not be construed as prohibiting Employee from making personal investments in such form or manner as will neither require his services in the operation or affairs of the enterprises in which such investments are made nor violate the terms of Section 4 hereof.

(b)   Company Responsibilities. The Company is responsible for:

    (i)   determining the necessity and using its diligent efforts, together with the Employee, to obtain all necessary work permits in all countries outside the United States of America (USA) where the Company may require the Employee to perform services; and

    (ii)   not requiring that Employee relocate his permanent residence from Newnan, Georgia, USA where an optional work office can be organized; and

    (iii)   using its diligent efforts, together with the Employee, to ensure that Employee does not spend more than 180 days outside the United States of America in performing his duties hereunder.

3.   Compensation. For all services rendered by Employee, the Company shall compensate Employee as follows:

   (a)   Base Salary. Beginning on the term of this Agreement, the base salary payable to Employee shall be One Hundred Twenty Thousand USA Dollars and No Cents ($120,000.00) per year (the "Base Salary"), payable from MHT USA's payroll on a regular basis in accordance with applicable standard payroll procedures and subject to mandatory deductions and withholdings.

   (b)   Perquisites, Benefits and Other Compensation. During the term of this employment hereunder, the Employee shall be entitled to receive additional benefits and compensation from the Company in such form and to such extent as specified below:

(i)     Reimbursement for all business travel and other out-of-pocket expenses reasonably incurred by Employee in the performance of his services pursuant to this Agreement. All reimbursable expenses shall be appropriately documented in reasonable detail by Employee upon submission of any request for reimbursement, and in a format and manner consistent with the Company's expense reporting policy.

(ii)    Six weeks of paid vacation per year, plus paid (USA) holidays on New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving, and Christmas. The Employee shall be entitled to up to two weeks of supplementary vacation per year without pay.

(iii)   The Company shall provide with a monthly stipend of $2,500 which the Employee hereby agrees to use toward the purchase of private medical insurance coverage [Options for health insurance coverage in both the US and Germany to be checked by MHT].

(iv)    The Company shall pay to the Employee in addition to Base Salary a sales commission of 0.4 % of all gross sales of the Company's products. The Company shall pay the commission twice a year in arrears of thirty (30) days after the end of each calendar half. The Company shall submit a sales report to the Employee. The Employee shall be entitled to annually receive, no later than one week after the financial statement of MHT AG for the respective financial year has become final and binding, a copy of an excerpt from such financial statement which contains the data required by the Employee to satisfactorily verify the correctness of the determination by the Company of the amount of the annual Commission paid or to be paid. The Commission will continue to be paid to the Employee, or his estate, until the third anniversary of the date on which the termination of this Agreement pursuant to Paragraphs 5(a) (death), 5(b) (disability), 5(d) (termination by Employee for cause) or 5(e) (termination by Company without cause) has become effective. In all other cases of termination, payment of the Commission shall end by the date the termination of this Agreement becomes effective (and in case of a termination becoming effective during a financial year be calculated on a *pro rata temporis* basis), except as set forth in paragraph 5(c).

4.      Non-Competition and Confidentiality Agreement and Employee Invention Agreement. Employee recognizes that the Company's willingness to enter into this Agreement and agreement to provide Employee with Confidential Information is based in material part on Employee's continual adherence to the provisions of the Non-Solicitation and Confidentiality Agreement and the Employee Invention Agreement previously executed as of the 1 day of August, 2005, which remain in effect, and that Employee's breach of the provisions of the Non-Solicitation and Confidentiality Agreement and/or the Employee Invention Agreement could materially damage the Company.

- 3 -

in case of termination by the Company without cause, the Non-Solicitation Covenant 4(b)(i)(ii) will be void as soon as the company discontinue paying base salary, monthly stipend and sales commission after termination of the employment. The Company and Employee have previously agreed that certain proprietary information developed by the Employee prior to entering into an Employment Agreement would remain as exclusive property of Employee.


5.    Term; Termination; Rights on Termination.  The term of this Agreement shall begin on January 26, 2007 and continue for a period of three years, i.e. until January 26, 2010. The aforementioned term shall automatically be extended for one additional year on January 26, of each year thereafter, i.e. beginning with January 26, 2010 (each anniversary being referred to as an "Anniversary"), unless either party notifies the other, in writing, on or before the thirtieth day prior to such Anniversary that he or it does not desire to renew the Agreement, in which event the Agreement will terminate on such subsequent Anniversary. The aforementioned notification shall have the legal consequences set forth in Paragraph 5(e) 3rd, 4th, and 5th sentence. Paragraph 3(b)(iv) (last sentence but one) and Paragraph 5(b), if such notice is made by the Company. If the aforementioned notification is made by the Employee, it shall have the legal consequences set forth in Paragraph 5(f) 3rd and 4th sentence, Paragraph 3(b)(iv) (last sentence) and Paragraph 6(c).

This Agreement and Employee's employment may – with any such legal consequences as set forth in this Paragraph 5 and in Paragraph 6 below – also be terminated in any one of the following ways:

(a)    *Death.*  The death of the Employee shall immediately terminate this Agreement with no severance compensation due to Employee's estate. However, the commission due to Employee pursuant to Paragraph 3(b)(iv) will be paid to Employee's estate.

(b)    *Disability.*  If, as a result of incapacity due to physical or mental illness or injury, Employee shall have been absent from full-time duties hereunder for three consecutive months, and is unable to perform the essential functions of his position, with or without reasonable accommodations, then 30 days after receiving written notice (which notice may occur before or after the end of such three-month period, but which shall not be effective earlier than the last day of such three (3) months period plus thirty (30) days), the Company may terminate Employee's employment hereunder provided Employee is unable to resume full-time duties at the conclusion of such notice period. Also, Employee may terminate his employment hereunder if his health should become impaired to an extent that makes the continued full performance of his duties hereunder hazardous to his physical or mental health or Employee's life, provided that Employee shall have furnished the Company with a written statement from a qualified doctor to such effect and provided, further, that, at the Company's request made within 30 days of the date of such written statement, Employee shall submit to an examination by a doctor selected by the Company who is reasonably acceptable to Employee or Employee's doctor and such Company doctor shall have concurred in the conclusion of Employee's doctor.

If this Agreement is terminated as a result of Employee's disability, Employee shall receive from the Company, upon signing and not revoking a complete release of all claims in favor of the Company, severance equal to six months' Base Salary, at the rate then in effect, payable each month during the six months period immediately following termination in accordance with the Company's standard payroll procedures and Employee shall not be entitled to any other damages as a result of such termination. Provided, however the waiver or claims shall not include the commission set forth in Paragraph 3(b)(iv).

    (c)   *By Company For Cause.*  The Company may terminate this Agreement 10 days after written notice to Employee for cause, "cause" shall be defined for purposes of this Agreement as: (i) Employee's material breach of this Agreement; (ii) Employee's dishonesty, fraud or misconduct with respect to the business or affairs of the Company and/or MHT USA which materially and adversely affects the operations or reputation of the Company and/or MHT USA. In the event of a termination for cause, as enumerated above, the Company shall pay to the Employee his then current Base Salary and benefits accrued, and any expenses for which the Employee is entitled to be reimbursed, up to and including the effective date of such termination. The employee shall be entitled to payment of sales commission for a period of six months after such a termination has been declared by the company. The Employee shall not be entitled to any other salary, bonus, benefits, severance or other compensation as a result of termination pursuant to this Paragraph 5(c).

    (d)   *By Employee For Cause.*  Similarly, Employee may terminate this Agreement ten (10) days after written notice to Employer for cause, which shall be Employer's material breach of this Agreement. In the event of this termination, the Company will loose the exclusive rights to use any technical solutions proposed by Employee or licensed to the Company as set forth in § 6 unless agreed otherwise between the parties to this Agreement.

    (e)   *By Company Without Cause.*  At any time during the Term, the Company may, without cause, terminate this Agreement and Employee's employment. The Company shall provide Employee not less than 90 days advance written notice of any such termination and the first date of effectiveness of such termination without cause shall be the third anniversary of the date hereof. Should Employee be terminated by the Company without cause during the Term, Employee shall receive from the Company, upon signing and not revoking a release of all claims against the Company, severance equal to the sum of three months' Base Salary at the rate then in effect payable each month during the three months' period immediately following termination in accordance with the Company's standard payroll procedures and shall not be entitled to any other damages as a result of such termination. The Employee shall not be entitled to any other salary, bonus, benefits, severance or other compensation as a result of termination pursuant to this Paragraph 5(e). The Company will, however, loose exclusive rights to use any technical solutions proposed by Employee and the right to use any Employee Proprietary Information unless agreed otherwise between the parties to this Agreement.

(f)    *By Employee Without Cause.*  At any time during the Term, the Employee may, without cause, terminate this Agreement and Employee's employment.  The Employee shall provide the Company at least 60 days advance written notice of a voluntary termination of employment. If Employee resigns or otherwise terminates his employment without cause pursuant to this Section 5(f), the Company shall pay to the Employee his then current Base Salary and benefits accrued, and any expenses for which the Employee is entitled to be reimbursed, up to and including the effective date of such termination.

The Employee shall not be entitled to any other salary, bonus, benefits, severance or other compensation as a result of termination pursuant to this Paragraph 5(f).

(g)    After at least 3 years from the date of this agreement, employee may elect (with minimum 6 months prior notice) to work for the Company as part time employee with not less than 50% of the regular working hours. This elected part time employment will not be used as a base for termination of the employment agreement or any Company obligations. However, total compensation will be reduced proportionally to the working time. Sales commission will be reduced proportionally after one year after election of part time.

6.    License of Employee's Technology and Proprietary Information.  The Employee is the owner of certain ideas, which are set forth in the category "Conceived Ideas" on page 3 on Exhibit A to the Employee Invention Agreement (hereinafter collectively referred to as the "Employee Proprietary Information"). Such Exhibit A also includes certain patents previously assigned or transferred to others, (see categories "Assigned Patents" and "Pending Patents" therein).

(a)    Employee, in consideration of the receipt of the sales commission set forth in Paragraph 3(b)(iv) herein, does hereby grant to the Company an exclusive license to use, incorporate and market in its products and services all current and previously unassigned Employee Proprietary Information (i.e. those mentioned, and declared as unassigned, in the category "Conceived Ideas" on page 3 of Exhibit A to the Employee Invention Agreement).

(b)    The license granted in Paragraph 5(a) shall expire upon the effectiveness of a termination of this Agreement pursuant to Paragraphs 5(a) (death), 5(b) disability, 5(d) (termination by Employee for cause) or 5(e) (termination by Company without cause).

(c)    The license granted in Paragraph 5(a) shall, however, not expire, but, to the extent legally permissible, continue to remain in full effect in such unlimited and exclusive form as described in Paragraph 6(a) for an indefinite period of time in case of, and in consideration for, the termination of this Agreement pursuant to Paragraphs 5(c) (termination by Company for cause) or 5(f) (termination by Employee without cause)..

(d)    Upon termination of this Agreement pursuant to Paragraphs 5(a) (death) or 5(b) (disability) the Company shall have the first right to enter into a continuing license for the use of the Employee Proprietary Information with the Employee or the personal representative of the Employee's estate, on terms and conditions mutually acceptable to the Company and the Employee or the personal representative of Employee's estate.

- 6 -

7.   Return of Company Property.   All records, designs, patents, business plans, financial statements, manuals, memoranda, lists and other property delivered to or compiled by Employee by or on behalf of the Company or any of its Affiliates or the representatives, vendors or customers thereof that pertain to the business of the Company or any of its Affiliates shall be and remain the property of the Company or such Affiliates, as the case may be, and be subject at all times to the discretion and control thereof.   Likewise, all correspondence, reports, records, charts, advertising materials and other similar data pertaining to the business, activities or future plans of the Company or any Affiliate of the Company that are collected or held by Employee shall be delivered promptly to the Company or such Affiliate, as the case may be, without request by such party, upon termination of Employee's employment, without regard to the cause or reasons for such termination.   Upon the request by Employee, on the date of expiration of the licence pursuant to Paragraph 6 above or at any time thereafter, the Company shall return to the Employee all documents and documentation relating to Employee Proprietary Information.

8.   Assignment; Binding Effect.   The parties acknowledge and agree that the covenants, terms and provisions contained in this Agreement constitute a personal employment contract and the rights and obligations of the parties hereunder cannot be transferred, sold, assigned, pledged or hypothecated, except that the rights and obligations of the Company under this Agreement may be assigned or transferred pursuant to a sale of the business, merger, consolidation, share exchange, sale of substantially all of the Company's assets, or other reorganization, or through liquidation, dissolution or otherwise, whether or not the Company is the continuing entity, provided, however, that such assignment or transfer shall in any event not otherwise change or amend the rights and obligation of the parties hereunder.

Employee understands that Employee has been selected for employment by the Company on the basis of his personal qualifications, experience and skills and the Employee may not assign his performance obligations hereunder, but may assign any residual rights to the Employee Proprietary Information with the Company's prior written consent which consent shall not be unreasonably withheld.   This Agreement is binding on the parties hereto and their respective heirs, administrators, personal representatives, successors and assigns.

9.   Complete Agreement.   This Agreement including Exhibit A attached hereto supersedes all prior oral or written agreements by and between the Company and Employee. Other than this Agreement including Exhibit A attached hereto and the Non-Solicitation and Confidentiality Agreement and the Employee Invention Agreement, Employee has no oral understandings or agreements with the Company or any of its affiliated entites, or any of the Company's or any affiliate's officers, directors or representatives covering the same subject matter as this Agreement.   This written Agreement including Exhibit A attached hereto is the final, complete and exclusive statement and expression of the agreement between the Company and Employee and of all the terms of this Agreement, and it cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements.   This written Agreement may not be later modified except by a further writing signed by a duly authorized officer of the Company and Employee, and no term of this Agreement may be waived except by writing signed by the party waiving the benefit of such term.

- 7 -

10.    Notice.  Whenever any notice is required hereunder it shall be given in writing addressed as follows:

If to the Company:    Mold & Hotrunner Technology AG
                      Dr. Ruben Rausing Strasse 7
                      Hochheim am Main D 65239
                      Attn:  Christoph Kückels


If to the Employee:   Mr. Witold Neter
                      62 Shadow Lake Trail
                      Newnan, Georgia  30265


Notice shall be deemed given and effective three days after the deposit in the national mail of a writing addressed as above and sent first class mail, certified, return receipt requested, or when actually received.  Either party may change the address for notice by notifying the other party of such change in accordance with this Section 10.

11.    Severability; Headings.  If any portion of this Agreement is held invalid or inoperative, the other portions of this Agreement shall be deemed valid and operative and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion held invalid or inoperative.

The Section headings herein are for reference purposes only and are not intended in any way to describe, interpret, define or limit the extent or intent of the Agreement or any part hereof.

12.    Governing Law; Venue.  This Agreement shall be covered by, construed, applied and reinforced in accordance with the internal laws of the State of Georgia, without regard to conflicts of law provisions.  The parties agree that any action or proceeding to enforce or arising out of this Agreement shall be commenced in the state courts, or in the United States District Court, in Atlanta, Georgia.  The parties consent to such jurisdiction, agree that venue will be proper in such courts and waive any objections based upon Forum Non Conveniens.  The choice of forum set forth in this section shall not be deemed to preclude the enforcement of any action under this Agreement in any other jurisdiction.

13.    Provisions Which Survive the Termination of this Agreement.  Paragraphs 3(b)(iv), 4, 5, 6 and 7 shall survive the termination of this Agreement to the extent set forth therein.

14.    Conflict with Other Agreements.  To the extent that any of the provisions of this Agreement shall conflict with the terms and conditions of the Non-Solicitation and Confidentiality Agreement or the Employee Invention Agreement, the terms and conditions of this Agreement shall control

- 8 -

15.   Governing Law.  This Agreement shall in all respects be construed according to the laws of the State of Georgia.

COMPANY

MOLD & HOTRUNNER TECHNOLOGY AG

_____

EMPLOYEE:

_____
WITOLD NETER

- 9 -

## SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **WITOLD NETER,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **CIVIL ACTION FILE** |
| **vs.** | ) | |
| | ) | **NUMBER** 2010CV188970 |
| **MOLD & HOTRUNNER** | ) | |
| **TECHNOLOGY AG,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### VERIFICATON

Personally appeared before the undersigned officer duly authorized by law to administer

oaths, **WITOLD NETER,** named Plaintiff in the above-referenced case, and stated that the facts

alleged in the foregoing Verified Complaint for Damages are true and correct to the best of his

knowledge and belief.

This _28_ day of _July_____, 2010.

_____

**WITOLD NETER**

Sworn to and subscribed before me
this _29th_ day of _July_____,
2010

_____
Notary Public



# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
## SUMMONS

Case No.: 2010CV189970

WITOLD NETER _____

_____

**Plaintiff,**

vs.

MOLD & HOTRUNNER TECHNOLOGY
AG _____

_____

**Defendant**

TO THE ABOVE NAMED DEFENDANT(S):

Your are hereby summoned and required to file with the Clerk of said Court and serve upon plaintiff's attorney, whose name and address is:

        Jackson L. Culbreth, Esq.
        Attorney at Law
        115 Perimeter Center Place
        Suite 900
        Atlanta, Georgia  30346

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This _____30_____ day of ___July___, 20 _10_

        Honorable Cathelene "Tina" Robinson
        Clerk of Superior Court

        By _____
               Deputy Clerk

To defendant upon whom this petition is served:

This copy of complaint and summons was served upon you_____, 20_____

_____
           Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

## General Civil Case Filing Information Form (Non-Domestic)

**Court**
☑ Superior
☐ State

**County** FULTON

**Docket #** 2010CV188970

**Date Filed** JUL 30 2010
MM-DD-YYYY

FILED IN OFFICE
JUL 30 2010
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

**Plaintiff(s)**
NETER, WITOLD

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|-------------------------|--------|

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|-------------------------|--------|

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|-------------------------|--------|

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|-------------------------|--------|

**No. of Plaintiffs** 1

**Defendant(s)**
MOLD & HOTRUNNER TECHNOLOGY AG

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|-------------------------|--------|

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|-------------------------|--------|

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|-------------------------|--------|

| Last | First | Middle I. Suffix Prefix | Maiden |
|------|-------|-------------------------|--------|

**No. of Defendants** 1

**Plaintiff/Petitioner's Attorney**   ☐ Pro Se

Culbreth, Jackson L.

| Last | First | Middle I. | Suffix |
|------|-------|-----------|--------|

**Bar #** 200300

### Check Primary Type (Check only ONE)

☑ Contract/Account

☐ Wills/Estate

☐ Real Property

☐ Dispossessory/Distress

☐ Personal Property

☐ Equity

☐ Habeas Corpus

☐ Appeals, Reviews

☐ Post Judgment Garnishment, Attachment, or Other Relief

☐ Non-Domestic Contempt

☐ Tort (If tort, fill in right column)

☐ Other General Civil Specify _____

### If Tort is Case Type:
### (Check no more than TWO)

☐ Auto Accident

☐ Premises Liability

☐ Medical Malpractice

☐ Other Professional Negligence

☐ Product Liability

☐ Other Specify _____

**Are Punitive Damages Pleaded?** ☐ Yes ☐ No

*LGR*

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

**FILED IN OFFICE**

NOV 17 2010

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

WITOLD NETER,

       **Plaintiff,**

**vs.**

**MOLD & HOTRUNNER
TECHNOLOGY AG,**

       **Defendant.**

       **CIVIL ACTION FILE NO:
2010CV188970**

## NOTICE OF STATUS / SCHEDULING CONFERENCE

The Court will conduct a status / scheduling conference on **December 16**, 20**10** at **9:30** (**a.m.**)/ p.m. in Courtroom 5C of the Fulton County Justice Center Tower wherein it will hear reports regarding the current status of the case and set deadlines that will govern the future progress of this matter.

*This matter was filed on July 30, 2010; however, the record reflects that service has yet to be obtained upon Defendant Mold & Hotrunner Technology AG. Plaintiff shall come to the conference prepared to evidence that diligent and good faith efforts have been made to serve said Defendant. Failure to offer such evidence may result in the dismissal of this action. In the event that Plaintiff is able to perfect service prior to the conference, the Court should be notified to determine whether the matter should be re-set so that the newly-served Defendant may have an opportunity to review the lawsuit and file responsive pleadings prior to any status / scheduling conference.*

SO ORDERED this **16th** day of **Nov.**, 20**10**.

Shawn Ellen LaGrua

SHAWN ELLEN LaGRUA
Judge, Superior Court of Fulton County
Atlanta Judicial Circuit

cc:

Plaintiff:
Jackson L. Culbruth, Esq.
115 Perimeter Center Place
Suite 900
Atlanta, Georgia 30346

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

|  |  |  |
|---|---|---|
| WITOLD NETER, | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| vs. | * | **CIVIL ACTION FILE NO:** |
| | * | **2010CV188970** |
| MOLD & HOTRUNNER | * | |
| TECHNOLOGY AG, | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

## NOTICE OF STATUS / SCHEDULING CONFERENCE

The Court will conduct a status / scheduling conference on ___Jan 16___,
20_11_ at __9:30__ _a.m_ / p.m. in Courtroom 5C of the Fulton County Justice Center Tower
wherein it will hear reports regarding the current status of the case and set deadlines that will
govern the future progress of this matter.

*This matter was filed on July 30, 2010; however, the record reflects that service has yet
to be obtained upon Defendant Mold & Hotrunner Technology AG. Plaintiff shall come to
the conference prepared to evidence that diligent and good faith efforts have been made to
serve said Defendant. Failure to offer such evidence may result in the dismissal of this action.
In the event that Plaintiff is able to perfect service prior to the conference, the Court should be
notified to determine whether the matter should be re-set so that the newly-served Defendant
may have an opportunity to review the lawsuit and file responsive pleadings prior to any status
/ scheduling conference.*

SO ORDERED this _21st_ day of _December_, 20_10_.

_Shawn Ellen LaGrua_
SHAWN ELLEN LaGRUA
Judge, Superior Court of Fulton County
Atlanta Judicial Circuit

cc:
Plaintiff:
Jackson L. Culbruth, Esq.
115 Perimeter Center Place , Suite 900
Atlanta, Georgia 30346



# ZUSTELLUNGSZEUGNIS

# CERTIFICATE

# ATTESTATION

*LoR*

**FILED IN OFFICE**

FEB -7 2011

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

Die unterzeichnete Behörde beehrt sich, nach Artikel 6 des Übereinkommens zu bescheinigen,
The undersigned authority has the honour to certify, in conformity with article 6 of the Convention,
L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

*2010CV188970*

1. daß der Antrag erledigt worden ist *)
   that the document has been served *)
   que la demande a été exécutée *)

   - am (Datum) <u>07.01.2011</u>
     the (date)
     le (date)

   - in (Ort, Straße, Nummer) <u>65239 Hochheim, Dr. Ruben-Rausing-Str. 7</u>
     at (place, street, number)
     à (localité, rue, numéro)

   - in einer der folgenden Formen nach Artikel 5:
     in one of the following methods authorised by article 5:
     dans une des formes suivantes prévues à l'article 5:

     a) in einer der gesetzlichen Formen (Artikel 5 Absatz 1 Buchstabe a) *).
        in accordance with the provisions of sub-paragraph a) of the first paragraph of article 5 of the Convention *).
        selon les formes légales (article 5, alinéa premier, lettre a) *).

     ~~b) in der folgenden besonderen Form *):~~
        in accordance ~~with the~~ following particular method *):
        ~~selon la forme particulière suivante *):~~

     ~~c) durch einfache Übergabe *).~~
        by delivery ~~to the~~ addressee, who accepted it voluntarily *).
        ~~par remise simple *).~~

   Die in dem Antrag erwähnten Schriftstücke sind übergeben worden an:
   The documents referred to in the request have been delivered to:
   Les documents mentionnés dans la demande ont été remis à:

   - (Name und Stellung der Person) _____
     (identity and description of person)
     (identité et qualité de la personne)

   - Verwandtschafts-, Arbeits- oder sonstiges Verhältnis zum Zustellungsempfänger: _____
     relationship to the addressee (family, business or other):
     liens de parenté, de subordination ou autres, avec le destinataire de l'acte:

2. ~~daß der Antrag aus folgenden Gründen nicht erledigt werden konnte *):~~
   that the document has not been served, by reason of the following facts *):
   ~~que la demande n'a pas été exécutée, en raison des faits suivants *):~~

   _____

~~Nach Artikel 12 Absatz 2 des Übereinkommens wird die ersuchende Stelle gebeten, die Auslagen, die in der beiliegenden Aufstellung~~
~~im einzelnen angegeben sind, zu zahlen oder zu erstatten *).~~
In conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay or reimburse the expenses
detailed in the attached statement *).
Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail
~~figure au mémoire ci-joint *).~~

Anlagen
Annexes
Annexes

Zurückgesandte Schriftstücke: <u>KLageschrift in deutsch und englisch</u>
Documents returned:
Pièces renvoyées:

Gegebenenfalls Erledigungsstücke:                    Ausgefertigt in <u>Wiesbaden</u>        am <u>11.01.2011</u>
In appropriate cases, documents establishing the service:    Done at
Le cas échéant, les documents justificatifs de l'exécution:    Fait à

_____

Unterschrift und/oder Stempel.
Signature and/or stamp.

ANTRAG
AUF ZUSTELLUNG EINES GERICHTLICHEN ODER AUSSERGERICHTLICHEN
SCHRIFTSTÜCKS IM AUSLAND

REQUEST
FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS

DEMANDE
AUX FINS DE SIGNIFICATION OU DE NOTIFICATION À L'ÉTRANGER
D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE

Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke
in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965.

Convention on the service abroad of judicial and extrajudicial documents in civil or
commercial matters, signed at The Hague, on the 15th of November, 1965.

Convention relative à la notification à l'étranger des actes judiciaires ou extra-
judiciaires en matière civile ou commerciale, signée à La Haye, le 15 novembre 1965.

**Oberlandesgericht**
Frankfurt am Main

**2 5. Nov. 2010**     *

....... Anl. .............. Beleg(e) .......
(- .......... Doppel mit ............... Anl. -)
.............. Band Akten ................. Heft

| Bezeichnung und Anschrift der ersuchenden Stelle | Anschrift der Bestimmungsbehörde |
|---|---|
| Identity and address of the applicant | Address of receiving authority |
| Identité et adresse du requérant | Adresse de l'autorité destinataire |
| **BEC Rechtsanwälte** | **An den Herrn Präsidenten des Oberlandesgerichts** |
| **Osannstraße 37** | **Frankfurt am Main** |
| **64285 Darmstadt** | **Zeil 42** |
| | **60313 Frankfurt am Main** |

Die ersuchende Stelle beehrt sich, der Bestimmungsbehörde - in zwei Stücken - die unten angegebenen Schriftstücke mit der Bitte zu
übersenden, davon nach Artikel 5 des Übereinkommens ein Stück unverzüglich dem Empfänger zustellen zu lassen, nämlich

The undersigned applicant has the honour to transmit - in duplicate - the documents listed below and, in conformity with article 5 of the above-
mentioned Convention, requests prompt service of one copy thereof on the addressee, i. e.,

Le requérant soussigné a l'honneur de faire parvenir - en double exemplaire - à l'autorité destinataire les documents ci-dessous énumérés, en
la priant, conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au destinataire, à savoir:

(Name und Anschrift)   **Mold & Hotrunner Technology AG,  vertreten durch den Vorstand Werner Plass (Vorsitzender) und**
**Christoph Kückels, Dr. Ruben-Rausing-Str. 7,  65239 Hochheim am Main**

(identity and address)
(identité et adresse)

a) in einer der gesetzlichen Formen (Artikel 5 Absatz 1 Buchstabe a) *).
   in accordance with the provisions of sub-paragraph a) of the first paragraph of article 5 of the Convention *).
   selon les formes légales (article 5, alinéa premier, lettre a) *).

b) in der folgenden besonderen Form (Artikel 5 Absatz 1 Buchstabe b) *).
   in accordance with the following particular method (sub-paragraph b) of the first paragraph of article 5) *).
   selon la forme particulière suivante (article 5, alinéa premier, lettre b) *).

c) gegebenenfalls durch einfache Übergabe (Artikel 5 Absatz 2) *).
   by delivery to the addressee, if he accepts it voluntarily (second paragraph of article 5) *)
   le cas échéant, par remise simple (article 5, alinéa 2) *).

Die Behörde wird gebeten, der ersuchenden Stelle ein Stück des Schriftstücks - und seiner Anlagen *) - mit dem Zustellungszeugnis auf der
Rückseite zurückzukommen oder zurücksenden zu lassen.

The authority is requested to return or to have returned to the applicant a copy of the documents - and of the annexes *) - with a certificate as
provided on the reverse side.

Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes *) - avec l'attestation figurant
au verso.

Verzeichnis der Schriftstücke
List of documents
Enumération des pièces

**Schadensersatzklage (Complain for damages) gegen die Mold**
**& Hotrunner Technology AG vor dem Superior Court von**
**Fulton County (Georgia/USA) vom 28.07.2010 und Verfügung**
des Gerichts vom 30.7.2010 (summons dated 30.7.2010),

Ausgefertigt in **Darmstadt** am **22.11.2010**
Done at
Fait à

Signature et/ou cachet.

*) Unzutreffendes streichen.
   Delete if inappropriate.
   Rayer les metions inutiles.

# ZUSTELLUNGSZEUGNIS

# CERTIFICATE

# ATTESTATION

_____

Die unterzeichnete Behörde beehrt sich, nach Artikel 6 des Übereinkommens zu bescheinigen,
The undersigned authority has the honour to certify, in conformity with article 6 of the Convention,
L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,

1. daß der Antrag erledigt worden ist *)
   that the document has been served *)
   que la demande a été exécutée *)

   - am (Datum) _____
     the (date)
     le (date)

   - in (Ort, Straße, Nummer) _____
     at (place, street, number)
     à (localité, rue, numéro)

   - in einer der folgenden Formen nach Artikel 5:
     in one of the following methods authorised by article 5:
     dans une des formes suivantes prévues à l'article 5:

       a) in einer der gesetzlichen Formen (Artikel 5 Absatz 1 Buchstabe a) *).
          in accordance with the provisions of sub-paragraph a) of the first paragraph of article 5 of the Convention *).
          selon les formes légales (article 5, alinéa premier, lettre a) *).

       b) in der folgenden besonderen Form *):
          in accordance with the following particular method *):
          selon la forme particulière suivante *):

       c) durch einfache Übergabe *).
          by delivery to the addressee, who accepted it voluntarily *).
          par remise simple *).

   Die in dem Antrag erwähnten Schriftstücke sind übergeben worden an:
   The documents referred to in the request have been delivered to:
   Les documents mentionnés dans la demande ont été remis à:

   - (Name und Stellung der Person) _____
     (identity and description of person)
     (identité et qualité de la personne)

   - Verwandtschafts-, Arbeits- oder sonstiges Verhältnis zum Zustellungempfänger: _____
     relationship to the addressee (family, business or other):
     liens de parenté, de subordination ou autres, avec le destinataire de l'acte:

2. daß der Antrag aus folgenden Gründen nicht erledigt werden konnte *):
   that the document has not been served, by reason of the following facts *):
   que la demande n'a pas été exécutée, en raison des faits suivants *):

_____

Nach Artikel 12 Absatz 2 des Übereinkommens wird die ersuchende Stelle gebeten, die Auslagen, die in der beiliegenden Aufstellung im
einzelnen angegeben sind, zu zahlen oder zu erstatten *).
In conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in
the attached statement *).
Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au
mémoire ci-joint *).

Anlagen
Annexes
Annexes

Zurückgesandte Schriftstücke: _____
Documents returned:
Pièces renvoyées:

Gegebenenfalls Erledigungsstücke:          Ausgefertigt in _____ am _____
In appropriate cases, documents establishing the service:   Done at
Le cas échéant, les documents justificatifs de l'exécution:   Fait à

_____          Unterschrift und/oder Stempel.
                 Signature and/or stamp.
                 Signature et/ou cachet.

# ANGABEN ÜBER DEN WESENTLICHEN INHALT DES ZUZUSTELLENDEN SCHRIFTSTÜCKS

## SUMMARY OF THE DOCUMENT TO BE SERVED

### ÉLÉMENTS ESSENTIELS DE L'ACTE

Übereinkommen über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland
in Zivil- oder Handelssachen, unterzeichnet in Den Haag am 15. November 1965.
(Artikel 5 Absatz 4)

Convention on the service abroad of judicial and extrajudicial documents in civil or
commercial matters, signed at The Hague, on the 15th of November, 1965.
(article 5, fourth paragraph)

Convention relative à la notification à l'étranger des actes judiciaires ou extra-
judiciaires en matière civile ou commerciale, signée à La Haye, le 15 novembre 1965.
(article 5, alinéa 4)

Bezeichnung und Anschrift der ersuchenden Stelle: <u>BEC Rechtsanwälte, Osannstraße 37, 64285 Darmstadt</u>
Name and address of the requesting authority:
Nom et adresse de l'autorité requérante:

Bezeichnung der Parteien *): <u>Kläger (plaintiff) Witold Neter, 62 Shadow Lake Trail, Newnan, Georgia 30265</u>
<u>Beklagte (defendant) Mold & Hotrunner  Technology AG,  vertreten durch den Vorstand Werner Plass</u>
<u>(Vorsitzender) und Christoph Kückels, Dr. Ruben-Rausing-Str. 7 65239 Hochheim am Main</u>
Particulars of the parties *):
Identité des parties *):

### GERICHTLICHES SCHRIFTSTÜCK **)
#### JUDICIAL DOCUMENT **)
##### ACTE JUDICIAIRE **)

Art und Gegenstand des Schriftstücks: <u>beeidigte Schadensersatzklage vom 28.7.2010 (verified complaint for damages dated 28.7.2010)</u>
<u>gegen die Mold & Hotrunner Technology AG vor dem Superior Court von Fulton County</u>
<u>(Georgia/USA) und gerichtliche Verfügung vom 30.7.210 (summons dated 30.7.2010)</u>
Nature and purpose of the document:
Nature et objet de l'acte:

Art und Gegenstand des Verfahrens, gegebenenfalls Betrag der geltend gemachten Forderung:
Nature and prupose of the proceedings and, where appropriate, the amount in dispute:
Nature et objet de l'instance, les cas échéant, le montat du litige:

<u>Schadensersatzanspruch auf a) Unterlassung b) Rechnungslegung c) Provisionszahlung</u>
<u>(complaint for damages a) cease the use of property information b) accounting c) payment of commission)</u>

Termin und Ort für die Einlassung auf das Verfahren **): Klageerwiderung innerhalb von 30 Tagen nach Zustellung der Klageschrift,
Superior Court of Fulton County, Georgia, 136 Pryor Street, Room C-103,
Atlanta Georgia 30303, USA

Date and place for entering appearance **):
Date et lieu de la comparution **):

Gericht, das die Entscheidung erlassen hat **): <u>Superior Court of Fulton County, Georgia, 136 Pryor Street, Room C-103,</u>
<u>Atlanta Georgia 30303, USA</u>
Court which has given judgment **):
Juridiction qui a rendu la décision **):

Datum der Entscheidung **): <u>Verfügung (summons) vom 30.07.2010</u>
Date of judgment **):
Date de la décision **):

Im Schriftstück vermerkte Fristen **): <u>Klageerwiderung innerhalb von 30 Tagen nach Zustellung der Klage an das Gericht und</u>
<u>Zustellung an den Klägervertreter Jackson L Culbreth, Attorney at Law, 115 Perimeter Center Place, Suite 900, Atlanta Georgia 30346</u>
<u>(USA) (answer to the compailnt within 30 days after service of complaint to file with the Clerk of said Court to plaintiff's attorney</u>
<u>Jackson L Culbreth, Attorney at Law, 115 Perimeter Center Place, Suite 900, Atlanta Georgia 30346 (USA)</u>
Time limits stated in the document **):
Indication des délais figurant dans l'acte **):

### AUSSERGERICHTLICHES SCHRIFTSTÜCK **)
#### EXTRAJUDICIAL DOCUMENT **)
##### ACTE EXTRAJUDICIAIRE **)

Art und Gegenstand des Schriftstücks: _____
Nature and purpose of the document:
Nature et objet de l'acte:

*) Gegebenenfalls Name und Anschrift der an der Übersendung des Schriftstücks interessierten Person.
  If appropriate, identity and address of the person interested in the transmission of the document.
  S'il     lieu, identité et adresse de la personne intéressée à la transmission de l'acte.

**) Unzutreffendes streichen.
  Delete if inappropriate.
  Rayer les metions inutiles.

# <u>Vollmacht/Power of Attorney</u>

| | |
|---|---|
| Ich, Witold Neter, 62 Shadow Lake Trail, Newnan, Georgia 30265 | I, Witold Neter, 62 Shadow Lake Trail, Newnan, Georgia 30265 |
| nachstehend „Vollmachtgeber" genannt, bevollmächtige hiermit Herrn Rechtsanwalt Bernd Emanuel, BEC Rechtsanwälte, Osannstraße 37, 64285 Darmstadt | – hereafter called „principal" – herewith give power of attorney to Attorney at Law Bernd Emanuel, BEC Rechtsanwälte, Osannstraße 37, 64285 Darmstadt |
| nachstehend „Bevollmächtigter" genannt, | – hereafter called „agent" – |
| mich befreit von § 181 BGB wie folgt zu vertreten: | to represent me, exempted from sec. 181 BGB (German Civil Code), as follows: |
| Alle Erklärungen abzugeben und Handlungen vorzunehmen, die erforderlich oder zweckdienlich sind, um in dem Verfahren gegen Mold & Hotrunner Technology AG, Dr. Ruben-Rausing-Str.7, 65239 Hochheim am Main vor dem Superior Court of Fulton County, die dort eingereichte Klage nach dem Haager Übereinkommen vom 15. November 1965 über die Zustellung gerichtlicher und außergerichtlicher Schriftstücke im Ausland in Zivil- oder Handelssachen (HZÜ) in Deutschland zuzustellen | He may undertake all legal transactions and undertake all acts which are necessary or useful for the service of process of the complaint in the lawsuit against Mold & Hotrunner Technology AG, Dr. Ruben-Rausing-Str.7, 65239 Hochheim am Main in the Superior Court of Fulton County pursuant to the "Hague Convention of the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters from 1965 (HZÜ)" in Germany. |

Newnan, den …September 2010,

Newnan, the 15.ᵗʰ of September 2010

BEC Rechtsanwälte · Osannstraße 37 · 64285 Darmstadt
Bernd Emanuel · Tel.: (0 61 51) 2 79 38 17 · Fax: (0 61 51) 2 79 38 27 · E-Mail: emanuel@bec-rechtsanwaelte.de
Christian Erbs · Tel.: (0 61 51) 2 79 38 16 · Fax: (0 61 51) 2 79 38 26 · E-Mail: erbs@bec-rechtsanwaelte.de
Volksbank Darmstadt · BLZ: 508 900 00 · Konto: 8907

BRENDA B. TAYLOR
NOTARY
GEORGIA
EXPIRES MAY 7, 2011
PUBLIC

*Beglaubigte auszugsweise Übersetzung aus der englischen in die deutsche Sprache*

ZWEITES ORIGINAL
ZUSTELLUNGSABSCHRIFT

[Siegel des Superior Court, Fulton County, Georgia]

# VOR DEM SUPERIOR COURT OF FULTON COUNTY, GEORGIA

### 136 PRYOR STREET, ZIMMER C-103, ATLANTA, GEORGIA 30303

## KLAGESCHRIFT

|  |  |  |
|---|---|---|
| WITOLD NETER | ) | **Aktenzeichen:** [handschriftlich] **2010CV188970** |
|  | ) |  |
|  | ) |  |
| **Kläger** | ) |  |
|  | ) |  |
| **gegen** | ) |  |
|  | ) |  |
| MOLD & HOTRUNNER TECHNOLOGY AG | ) |  |
|  | ) |  |
| **Beklagte** | ) |  |
|  | ) |  |

AN DIE VORSTEHEND GENANNTE(N) BEKLAGTE(N):

Sie werden hiermit geladen und aufgefordert, bei dem Urkundsbeamten des benannten Gerichts innerhalb von 30 Tagen nach der Zustellung dieser Ladung (wobei der Tag der Zustellung bei der Fristberechnung nicht zu berücksichtigen ist) eine Klageerwiderung auf die Ihnen hiermit zugestellte Klage einzureichen. Die Klageerwiderung ist dem Prozessvertreter des Klägers zuzustellen, dessen Name und Anschrift wie folgt lauten:

RA Jackson L. Culbreth
Rechtsanwalt
115 Perimeter Center Place
Suite 900
Atlanta, Georgia 30346

## WENN SIE DIES UNTERLASSEN, WIRD ÜBER DEN MIT DER KLAGESCHRIFT VERLANGTEN RECHTBEHELF EIN VERSÄUMNISURTEIL GEGEN SIE ERGEHEN.

An diesem [handschriftlich] ___30.___ [handschriftlich] ___Juli___ 20 [handschriftlich] ___10___

Die Ehrenwerte Cathelene „Tina" Robinson
Urkundsbeamtin des Superior Court

durch: __[unleserliche Unterschrift]__
Stellvertretende Urkundsbeamtin

An die Beklagte, der diese Klageschrift zugestellt wird:

Diese Abschrift der Klageschrift und der Ladung wurde Ihnen am ___.___ __ __ _____ 20 __ _____ zugestellt.

___ __ __ __ _____
Stellvertretender Sheriff

**Anweisung: Sofern erforderlich ist ein zusätzliches Blatt für weitere Parteien anzufügen. Wird ein zusätzliches Blatt verwendet, ist dies auf diesem Blatt zu vermerken**

[Stempel:
EINGEREICHT (unleserliches Kürzel)
30. Juli 2010
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA]

## SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| WITOLD NETER, | ) | |
| | ) | |
| Kläger | ) | ZIVILVERFAHREN |
| | ) | |
| gegen | ) | AKTENZEICHEN _____ |
| | ) | |
| MOLD & HOTRUNNER | ) | |
| TECHNOLOGY AG, | ) | |
| | ) | |
| Beklagte | ) | |

## SCHADENSERSATZKLAGE IN BEGLAUBIGTER FORM

**HIERMIT** reicht der Kläger, vertreten durch seinen zur Prozessführung bevollmächtigten Rechtsanwalt, die vorliegende Klage gegen die Beklagte ein und legt dem Gericht Folgendes dar:

1.

Der Kläger, eine natürliche Person mit Wohnsitz im US-Bundesstaat Georgia, hat in der Vergangenheit einen schriftlichen Vertrag mit der Beklagten, der Mold & Hotrunner Technology AG, über bestimmtes geschütztes geistiges Eigentum des Klägers geschlossen.

2.

Die Beklagte, die Mold & Hotrunner Technology AG („MHT"), ein deutsches Unternehmen, hat sich gemäß den Bestimmungen des Vertrages zwischen dem Kläger und der Beklagten der Gerichtsbarkeit dieses Gerichts unterworfen.

3.

Eine wahrheitsgetreue Kopie des Vertrages zwischen dem Kläger und der Beklagten (nachfolgend teilweise auch als der „MHT-Vertrag" bezeichnet), ist dieser Klageschrift als Anhang „A" beigefügt und wird durch diese Bezugnahme Bestandteil dieser Klageschrift.

- 1 -

4.

Die Beklagte ist eine deutsche Aktiengesellschaft und ist in dem US-Bundesstaat Georgia geschäftlichen Aktivitäten nachgegangen. Gemäß den Bestimmungen des MHT-Vertrages hat sich die Beklagte der Gerichtsbarkeit dieses Gerichts unterworfen und ihr kann gemäß *Official Code of Georgia Annotated* („O.C.G.A.") § 9-11-4(F)(3) sowie den dort genannten anwendbaren Gesetzen an ihrem Hauptgeschäftssitz in Deutschland ein zweites Original zugestellt werden.

5.

Gemäß den Bestimmungen des MHT-Vertrages hat die Beklagte der örtlichen Zuständigkeit dieses Gerichts zugestimmt.

6.

Die Beklagte hat sich gemäß den Bestimmungen des MHT-Vertrages einverstanden erklärt, das von dem Kläger geschaffene geistige Eigentum, einschließlich der im Namen des Klägers eingetragenen Patente, zu bestimmten Bedingungen so lange zu lizenzieren, wie die Beklagte die Bestimmungen des MHT-Vertrages einhält.

7.

Die Beklagte hat Vertragsbestimmungen des MHT-Vertrages durch das Versäumnis verletzt, rechtzeitig Zahlungen an den Kläger gemäß den Bestimmungen des MHT-Vertrages zu leisten.

8.

Der Kläger hat den MHT-Vertrag gemäß den in dem Vertrag enthaltenen Regelungen aus wichtigem Grund gekündigt.

9.

Nach der Kündigung des MHT-Vertrages blieb die Beklagte zur Zahlung der Provision für die am 31. Dezember 2008 sowie am 30. Juni 2009 endenden Zeiträume verpflichtet.

10.

Nach der Kündigung des MHT-Vertrages aus wichtigem Grund aufgrund einer Vertragsverletzung durch die Beklagte hat die Beklagte die fällige Provision für die am 31. Dezember 2008 sowie am 30. Juni 2009 endenden Zeiträume gezahlt, es jedoch unterlassen, weitere Provisionszahlungen an den Kläger zu leisten.

11.

Nach der Kündigung des MHT-Vertrages aufgrund einer Vertragsverletzung durch die Beklagte blieb die Beklagte verpflichtet und dafür verantwortlich, die Provision für einen Zeitraum von weiteren drei (3) Jahren an den Kläger zu zahlen.

12.

Die Beklagte war gemäß den Bestimmungen des MHT-Vertrages verpflichtet, dem Kläger zum Ende jedes Halbjahres des jeweiligen Kalenderjahres eine Abrechnung der Gesamtbruttoumsätze vorzulegen sowie dem Kläger innerhalb von dreißig (30) Tagen nach Vorlage dieser Abrechnung eine Summe von vier Zehnteln eines Prozents (0,4 %) des gesamten in der vorangehenden sechsmonatigen Abrechnungsperiode erwirtschafteten Bruttoumsatzes der Beklagten zu zahlen.

13.

Die Beklagte hat es versäumt, dem Kläger die Abrechnung für den am 31. Dezember 2009 endenden Zeitraum vorzulegen sowie die Provision für die Nutzung des geistigen Eigentums des Klägers für den am 31. Dezember 2009 endenden Zeitraum zu zahlen.

14.

Gemäß den Bestimmungen des MHT-Vertrages war die Beklagte verpflichtet, mit der Kündigung des MHT-Vertrages aus wichtigem Grund jegliche Nutzung des geistigen Eigentums des Klägers einzustellen.

15.

Nach bestem Wissen und Gewissen des Klägers nutzt die Beklagte weiterhin das geistige Eigentum des Klägers und verstößt damit gegen die Bestimmungen des MHT-Vertrages.

## ABSCHNITT 1
### Zurückbehaltung und Nutzung vertraulicher
### und geschützter Informationen

16.

Der Kläger trägt hiermit erneut die in den Ziffer 1 bis 15 dieser Klageschrift dargelegten Behauptungen vor, die durch diese Bezugnahme Bestandteil dieser Klageschrift werden.

17.

Die in dem MHT-Vertrag beschriebenen vertraulichen und geschützten Informationen des Klägers befinden sich im Besitz der Beklagten und die Beklagte hat die Kontrolle über diese Informationen, obwohl ihre Rechte zur Nutzung dieser Informationen erloschen sind.

18.

Bei den in dem MHT-Vertrag beschriebenen vertraulichen und geschützten Informationen des Klägers handelt es sich um vertrauliche, geschützte und wertvolle Informationen, die dem Kläger gehören.

19.

Der Kläger hat die Beklagte aufgefordert, die Nutzung der vertraulichen und geschützten Informationen einzustellen, was die Beklagte abgelehnt hat.

20.

Sollte die Beklagte nicht verpflichtet werden, jegliche Nutzung der vertraulichen und geschützten Informationen des Klägers zu unterlassen, wird dem Kläger ein nicht wieder gutzumachender Schaden entstehen, für den es keinen angemessenen Rechtsbehelf gibt.

### ABSCHNITT 2

### Abrechnung

21.

Der Kläger trägt hiermit erneut die in den Ziffern 1 bis 20 dieser Klageschrift dargelegten Behauptungen vor, die durch diese Bezugnahme Bestandteil dieser Klageschrift werden.

22.

Der MHT-Vertrag enthält die Verpflichtung, dem Kläger in jedem Kalenderjahr, in dem auch nach der Kündigung des MHT-Vertrages aus wichtigem Grund eine Provision an den Kläger zu zahlen ist, alle sechs (6) Monate eine Abrechnung vorzulegen.

23.

Die Beklagte hat dem Kläger keine Abrechnung vorgelegt und es abgelehnt, dieser Verpflichtung nachzukommen.

24.

Der Kläger hat Anspruch auf eine von der Beklagten zu erstellende Abrechnung über sämtliche Bruttoumsätze der Beklagten für den am 31. Dezember 2009 endenden Zeitraum.

25.

Der Kläger hat Anspruch auf zukünftig von der Beklagten zu erstellende Abrechnungen für die am 30. Juni 2010, am 31. Dezember 2010, am 30. Juni 2011, am 31. Dezember 2011 sowie am 30. Juni 2012 endenden Sechsmonatszeiträume.

## ABSCHNITT 3
### Zahlung der Provision

26.

Der Kläger trägt hiermit erneut die in den Ziffern 1 bis 25 dieser Klageschrift dargelegten Behauptungen vor, die durch diese Bezugnahme Bestandteil dieser Klageschrift werden.

27.

Für den am 31. Dezember 2009 endenden Zeitraum hat der Kläger für die Nutzung seiner vertraulichen und geschützten Informationen Anspruch auf Zahlung einer Provision in Höhe von vier Zehnteln eines Prozents (0,4 %) des Bruttoumsatzes der Beklagten.

28.

Der Kläger hat auch zukünftig, bis zu dem am 30. Juni 2012 (einschließlich) endenden Zeitraum, Anspruch auf Zahlung einer Provision in Höhe von vier Zehnteln eines Prozents (0,4 %) des zukünftigen Bruttoumsatzes der Beklagten.

**AUS DIESEM GRUND** beantragt der Kläger das folgende Urteil zu seinen Gunsten und zulasten der Beklagten zu erlassen:

(a)     Die Beklagte wird verpflichtet, eine Abrechnung über den Bruttoumsatz der Beklagten für den am 31. Dezember 2009 endenden Zeitraum sowie darüber hinaus für die zukünftigen am 30. Juni 2010, am 31. Dezember 2010, am 30. Juni 2011, am 31. Dezember 2011 sowie am 30. Juni 2012 endenden Zeiträume vorzulegen;

(b)     Schadensersatz in Höhe von vier Zehnteln eines Prozents (0,4 %) des

Bruttoumsatzes der Beklagten für den am 31. Dezember 2009 endenden Zeitraum sowie für

jeden der folgenden Sechsmonatszeiträume bis einschließlich des am 30. Juni 2012 endenden

Sechsmonatszeitraums; und

(c)     Jeglicher weitere Rechtsbehelf, den dieses Gericht als gerecht und

angemessen erachtet.

Am heutigen [*handschriftlich*]   30.   [*handschriftlich*]   Juli   2010.

Hochachtungsvoll eingereicht,

_____ [*unleserliche Unterschrift*]   _____
Jackson L. Culbreth
Georgia Bar No. 200300

Rechtsanwalt für den Kläger Witold Neter

115 Perimeter Center Place
Suite 900
Atlanta, Georgia 30346
(678) 252-6300

# ANHANG „A"

[*Faxkopf*]

## ARBEITSVERTRAG

Dieser Arbeitsvertrag (dieser „Vertrag") vom **26. Januar 2007** wird zwischen der **MOLD & HOTRUNNER TECHNOLOGY AG** („Gesellschaft") und **WITOLD NETER**, einem Einwohner des US-Bundesstaates Georgia, mit Wohnsitz in 62 Shadow Lake Trail, Newnan, Georgia, USA 30265 (der „Arbeitnehmer") geschlossen.

## PRÄAMBEL

Die Gesellschaft und der Arbeitnehmer haben bereits am 1. August 2005 einen Arbeitsvertrag, eine zugehörige Abwerbeverbots- und Vertraulichkeitsvereinbarung sowie einen Vertrag über Arbeitnehmererfindungen geschlossen.

Sowohl die Gesellschaft als auch der Arbeitnehmer wünschen den Abschluss eines neuen Arbeitsvertrages, der die Gesellschaft verpflichtet, den Arbeitnehmer gemäß den Bestimmungen dieses Vertrages als einen Mitarbeiter der Gesellschaft einzustellen und weiter zu beschäftigen, und der Arbeitnehmer wünscht das Beschäftigungsverhältnis zu diesen Bedingungen anzunehmen.

IN ANBETRACHT DES VORSTEHENDEN vereinbaren die Parteien unter Berücksichtigung der hierin enthaltenen gegenseitigen Versprechen, Bestimmungen, Absprachen und Bedingungen und deren Erfüllung was folgt:

## VEREINBARUNGEN:

1. <u>Beendigung des Früheren Arbeitsvertrages</u>. Der am 1. August 2005 geschlossene Arbeitsvertrag, einschließlich der am selben Tag geschlossenen, zugehörigen Abwerbeverbots- und Vertraulichkeitsvereinbarung zwischen der Gesellschaft und dem Arbeitnehmer (die „Abwerbeverbots- und Vertraulichkeitsvereinbarung") und des Vertrages über Arbeitnehmererfindungen (der „Vertrag über Arbeitnehmererfindungen"). Der Arbeitsvertrag wird hiermit aufgelöst, ist null und nichtig und nicht länger wirksam, die Abwerbeverbots- und Vertraulichkeitsvereinbarung und der Vertrag über Arbeitnehmererfindungen bleiben hingegen gemäß den Regelung in nachstehender Ziffer 4 wirksam bestehen.

2. <u>Anstellung und Verpflichtungen</u>. (a) Die Gesellschaft stellt den Arbeitnehmer hiermit:

    (i)    als *Director for Technical Strategy*,

    (ii)    als *Chief Technical Officer* für die MHT USA, LLC., einer 100%igen Tochtergesellschaft der Gesellschaft („MHT USA"), und

    (iii)    für weitere ihm von der Gesellschaft übertragene Aufgaben ein. Der Arbeitnehmer wird an den *President* der Gesellschaft oder an eine andere Person mit Führungsverantwortung für den Geschäftsbetrieb der Gesellschaft berichten. Der Arbeitnehmer ist verpflichtet, seine gesamten Bemühungen, seine gesamte Arbeitszeit sowie seine gesamte Aufmerksamkeit dem Geschäft und den Angelegenheiten der Gesellschaft und der MHT USA zu widmen und er hat die in diesem Vertrag geregelten Aufgaben und Pflichten eines Arbeitnehmers sorgfältig, ehrlich und kompetent zu erfüllen.

## ANHANG „A"

*[Faxkopf]*

Ungeachtet anders lautender Bestimmungen dieses Vertrages ist der Arbeitnehmer für die MHT USA nicht befugt, direkt oder indirekt die in Anhang A zu diesem Vertrag aufgeführten Handlungen ohne die ausdrückliche Zustimmung des *Board* freizugeben, zu genehmigen oder anderweitig auszuführen. Anhang A kann von dem *Board* von Zeit zu Zeit geändert werden. Der Arbeitnehmer nimmt hiermit das Beschäftigungsverhältnis zu den hierin genannten Bedingungen an und verpflichtet sich, seine Zeit und Aufmerksamkeit der Förderung des Geschäfts der Gesellschaft zu widmen und sich nach besten Kräften darum zu bemühen.

(iv) Der Arbeitnehmer ist verpflichtet, die von der Gesellschaft aufgestellten Richtlinien, die in der Gerichtsbarkeit, in der sie umgesetzt werden, nicht gegen geltendes Recht verstoßen, sorgfältig einzuhalten, auszuführen und zu erfüllen.

(v) Für die Dauer des Beschäftigungsverhältnisses nach Maßgabe dieses Arbeitsvertrages ist es dem Arbeitnehmer nicht gestattet, auf Gewinn, Profit oder andere Vermögensvorteile gerichteten geschäftlichen Aktivitäten nachzugehen, wenn diese Aktivitäten Auswirkungen auf die Pflichten und Verantwortlichkeiten des Arbeitnehmers aus diesem Arbeitsvertrag haben. Die vorstehenden Beschränkungen sind jedoch nicht dahingehend auszulegen, dass es dem Arbeitnehmer untersagt ist, persönliche Investitionen in einer Art und Weise zu tätigen, die weder seine Tätigkeit in dem Geschäftsbetrieb oder den Angelegenheiten des Unternehmens erfordert, noch gegen die in dieser Ziffer 4 enthaltenen Bestimmungen verstoßen.

(b)      Verpflichtungen der Gesellschaft. Die Gesellschaft ist dafür verantwortlich:

(i) festzustellen, ob eine Arbeitserlaubnis in den Ländern außerhalb der Vereinigten Staaten von Amerika (USA), in denen die Gesellschaft den Arbeitnehmer gegebenenfalls zur Leistungserbringung einsetzt, erforderlich ist, sowie für die Einholung der jeweiligen Arbeitserlaubnis; und

(ii) von dem Arbeitnehmer keine Verlagerung seines ständigen Wohnsitzes von Newnan, Georgia, USA, zu verlangen, wenn ein alternativer Arbeitsplatz eingerichtet werden kann; und

(iii) zusammen mit dem Arbeitnehmer angemessene Anstrengungen zu unternehmen um sicherzustellen, dass der Arbeitnehmer bei der Erbringung seiner in diesem Vertrag geregelten Leistungen nicht mehr als 180 Tage außerhalb der Vereinigten Staaten von Amerika verbringt.

3.      Vergütung. Die Gesellschaft ist verpflichtet, den Arbeitnehmer für sämtliche von ihm erbrachten Leistungen wie folgt zu vergüten:

(a)      *Grundgehalt.* Mit Beginn der Laufzeit dieses Vertrages beträgt das an den Arbeitnehmer zu zahlende Grundgehalt einhundertundzwanzigtausend US-Dollar und null Cent (USD 120.000,00) pro Jahr (das „Grundgehalt"). Das Grundgehalt ist regelmäßig gemäß den geltenden Standard-Gehaltszahlungsverfahren über die Gehaltslisten der MHT USA zu zahlen und unterliegt den vorgeschriebenen Abzügen und Einbehalten.

(b)      *Nebenleistungen, Zusatzleistungen und sonstige Vergütung.* Für die Dauer des Beschäftigungsverhältnisses nach Maßgabe dieses Arbeitsvertrages hat der Arbeitnehmer einen Anspruch gegen die Gesellschaft auf die nachfolgend aufgeführten Zusatzleistungen und Vergütungsbestandteile:

*[Faxkopf]*

(i)    Erstattung sämtlicher Reisekosten und sonstiger Auslagen, die angemessenerweise bei der Erbringung der Leistungen durch den Arbeitnehmer gemäß diesem Vertrag anfallen. Sämtliche zu erstattenden Auslagen sind von dem Arbeitnehmer bei der Einreichung eines Antrags auf Kostenerstattung angemessen detailliert und in geeigneter Form in der in der Kostenabrechnungsrichtlinie der Gesellschaft geregelten Form und Art zu dokumentieren.

(ii)    Sechs Wochen bezahlter Urlaub pro Jahr, zuzüglich der bezahlten (US-amerikanischen) Feiertage Neujahr, Memorial Day, Independence Day, Labor Day, Thanksgiving und Weihnachten. Darüber hinaus hat der Arbeitnehmer Anspruch auf bis zu zwei Wochen unbezahlten Urlaub pro Jahr.

(iii)    Die Gesellschaft ist verpflichtet, dem Arbeitnehmer monatliche Bezüge in Höhe von USD 2.500 zu zahlen und der Arbeitnehmer verpflichtet sich hiermit, diesen Betrag für den Abschluss einer privaten Krankenversicherung aufzuwenden. [Die Optionen für einen Krankenversicherungsschutz sowohl in den USA als auch in Deutschland werden von der MHT überprüft.]

(iv)    Die Gesellschaft ist verpflichtet, dem Arbeitnehmer zusätzlich zu dem Grundgehalt eine Verkaufsprovision in Höhe von 0,4 % auf den gesamten mit den Produkten der Gesellschaft erzielten Bruttoumsatz zu zahlen. Die Provision ist von der Gesellschaft zweimal jährlich rückwirkend innerhalb von dreißig (30) Tagen nach Ablauf jedes Kalenderhalbjahres zu zahlen. Die Gesellschaft ist verpflichtet, dem Arbeitnehmer einen Verkaufsbericht zur Verfügung zu stellen. Der Arbeitnehmer ist berechtigt, innerhalb von einer Woche nach der Feststellung des Jahresabschluss der MHT AG für das jeweilige Geschäftsjahr eine Kopie des Auszugs aus diesem Jahresabschluss zu erhalten, die die Daten enthält, die der Arbeitnehmer benötigt, um die Richtigkeit der Festlegungen der Gesellschaft zu dem Betrag der jährlich gezahlten oder zu zahlenden Provision zu seiner Zufriedenheit überprüfen zu können. Die Verpflichtung zur Zahlung der Provision an den Arbeitnehmer oder seine Erben endet drei Jahre nach Beendigung dieses Vertrages gemäß Ziffer 5(a) (Tod), 5(b) (Berufsunfähigkeit), 5(d) (Kündigung durch den Arbeitnehmer aus wichtigem Grund) oder 5(c) (Kündigung durch die Gesellschaft ohne Grund). In allen sonstigen Fällen einer Beendigung endet die Pflicht zur Zahlung der Provision an dem Tag, an dem die Beendigung dieses Vertrages in Kraft tritt (und im Falle einer Beendigung im Laufe eines Geschäftsjahres wird sie anteilig berechnet), soweit nicht in Ziffer 5(c) etwas Abweichendes geregelt ist.

4.    Abwerbeverbots- und Vertraulichkeitsvereinbarung und Vertrag über Arbeitnehmererfindungen. Der Arbeitnehmer erkennt an, dass die Bereitschaft der Gesellschaft zum Abschluss dieses Vertrages und deren Einverständnis, dem Arbeitnehmer vertrauliche Informationen zur Verfügung zu stellen, im Wesentlichen darauf beruhen, dass der Arbeitnehmer die Bestimmungen der bereits am 1. August 2005 geschlossenen Abwerbeverbots- und Vertraulichkeitsvereinbarung sowie des Vertrages über Arbeitnehmererfindungen vom selben Tag stetig einhält. Die Abwerbeverbots- und Vertraulichkeitsvereinbarung sowie der Vertrag über Arbeitnehmererfindungen bleiben bestehen und ein Verstoß gegen eine Bestimmung der Abwerbeverbots- und Vertraulichkeitsvereinbarung und/oder des Vertrages über Arbeitnehmererfindungen durch den Arbeitnehmer könnte der Gesellschaft einen erheblichen Schaden zufügen.

[*Faxkopf*]

Im Falle einer Kündigung durch die Gesellschaft ohne Grund wird das in Ziffer 4(b)(i)(ii) geregelte Abwerbeverbot nichtig, sobald die Gesellschaft nach der Kündigung des Beschäftigungsverhältnisses die Zahlungen des Grundgehalts, der monatlichen Bezüge und der Verkaufsprovision einstellt. Die Gesellschaft und der Arbeitnehmer haben in der Vergangenheit vereinbart, dass bestimmte von dem Arbeitnehmer vor Abschluss des Arbeitsvertrages entwickelte geschützte Informationen im alleinigen Eigentum des Arbeitnehmers verbleiben werden.

5. Laufzeit; Beendigung; Kündigungsrechte.Die Laufzeit dieses Vertrages beginnt am 26. Januar 2007 und endet nach Ablauf von drei Jahren, d. h. am 26. Januar 2010. Die vorstehend genannte Laufzeit verlängert sich automatisch um ein weiteres Jahr bis zum 26. Januar des jeweils folgenden Jahres, also beginnend mit dem 26. Januar 2010 (wobei jeder Jahrestag als ein „Jahrestag" bezeichnet wird), es sei denn, eine Partei teilt der jeweils anderen Partei schriftlich spätestens dreißig Tage vor dem jeweiligen Jahrestag mit, dass sie keine Erneuerung des Vertrages wünscht. In diesem Fall endet der Vertrag an dem jeweils folgenden Jahrestag. Die vorstehend genannte Mitteilung hat die in den Ziffern 5(e), Sätze 3, 4 und 5 bzw. im Falle einer Kündigung durch die Gesellschaft die in Ziffer 3(b)(iv) (vorletzter Satz) und in Ziffer 6(b) genannten rechtlichen Folgen. Erfolgt die vorstehend genannte Mitteilung durch den Arbeitnehmer, hat die Mitteilung die in den Ziffern 5(f) Sätze 3 und 4, Ziffer 3(b)(iv) (letzter Satz) und Ziffer 6(c) genannten rechtlichen Folgen.

Dieser Vertrag und das Beschäftigungsverhältnis mit dem Arbeitnehmer können – mit den in den nachstehenden Ziffern 5 und 6 genannten rechtlichen Folgen – auch auf folgende Art und Weise beendet werden:

(a) *Tod.* Der Tod des Arbeitnehmers hat die sofortige Beendigung dieses Vertrages zur Folge, ohne dass den Erben des Arbeitnehmers eine Abfindungszahlung geschuldet wird. Die dem Arbeitnehmer gemäß Ziffer3 (b)(iv) geschuldete Provision wird jedoch an die Erben gezahlt.

(b) *Berufsunfähigkeit.* War der Arbeitnehmer aufgrund einer durch körperliche oder psychische Krankheit verursachten Arbeitsunfähigkeit für drei (3) aufeinander folgende Monate nicht in der Lage, seinen Vollzeitverpflichtungen aus diesem Vertrag nachzukommen, und ist es dem Arbeitnehmer nicht möglich, mit oder ohne angemessene(n) Vorkehrungen die wesentlichen Aufgaben seiner Position zu erfüllen, ist die Gesellschaft berechtigt, dreißig (30) Tage nach Zugang einer schriftlichen Mitteilung (diese Mitteilung kann vor oder nach Ablauf dieses 3-Monatszeitraums erfolgen, eine solche Mitteilung wird jedoch frühestens am letzten Tag dieses 3-Monatszeitraums zuzüglich weiterer dreißig (30) Tage wirksam) das Beschäftigungsverhältnis mit dem Arbeitnehmer auf Grundlage dieses Arbeitsvertrages zu kündigen, wenn der Arbeitnehmer nicht in der Lage ist, nach Ablauf dieser Mitteilungsfrist seine Vollzeitverpflichtungen wieder aufzunehmen. Darüber hinaus ist der Arbeitnehmer berechtigt, das gemäß diesem Vertrag bestehende Beschäftigungsverhältnis zu kündigen, wenn seine Gesundheit in einem solchen Maße beeinträchtigt ist, dass die Fortführung der vollumfänglichen Erfüllung seiner hierin geregelten Pflichten eine Gefahr für die körperliche oder psychische Gesundheit des Arbeitnehmers oder für sein Leben darstellt, vorausgesetzt, der Arbeitnehmer hat der Gesellschaft eine entsprechende schriftliche Erklärung eines qualifizierten Arztes zur Verfügung gestellt und weiterhin vorausgesetzt, dass sich der Arbeitnehmer nach entsprechender Aufforderung durch die Gesellschaft, die innerhalb von dreißig (30) Tagen nach Zugang einer solchen schriftlichen Erklärung zu erfolgen hat, einer Untersuchung durch einen von der Gesellschaft bestimmten Arzt unterzieht, der für den Arbeitnehmer sowie für den Arzt des Arbeitnehmers annehmbar ist und dieser Arzt der Gesellschaft sich der Diagnose des Arztes des Arbeitnehmers anschließt.

[*Faxkopf*]

Wird dieser Vertrag wegen Berufsunfähigkeit des Arbeitnehmers gekündigt, hat der Arbeitnehmer Anspruch auf eine Abfindungszahlung in Höhe eines Betrages, der dem sechsfachen des zu diesem Zeitpunkt vereinbarten monatlichen Grundgehalts entspricht, vorausgesetzt, der Arbeitnehmer unterzeichnet zugunsten der Gesellschaft eine vollumfängliche Freistellung von sämtlichen Ansprüchen und diese Freistellung wird nicht widerrufen. Dieser Betrag ist in den unmittelbar auf die Kündigung folgenden sechs (6) Monaten jeden Monat gemäß den Standard-Gehaltszahlungsverfahren der Gesellschaft zu zahlen; darüber hinausgehende Schadensersatzansprüche des Arbeitnehmer als Folge einer solchen Kündigung sind ausgeschlossen. Der Verzicht oder die Ansprüche erstrecken sich jedoch nicht auf die in Ziffer 3(b)(iv) geregelte Provision.

(c)     *Durch die Gesellschaft aus wichtigem Grund.* Die Gesellschaft ist berechtigt, diesen Vertrag unter Einhaltung einer Kündigungsfrist von zehn (10) Tagen durch schriftliche Mitteilung an den Arbeitnehmer aus wichtigem Grund zu kündigen. Für die Zwecke dieses Vertrages bezeichnet ein „wichtiger Grund": (i) die Verletzung einer wesentlichen Vertragspflicht durch den Arbeitnehmer; und (ii) Unehrlichkeit, Betrug oder Fehlverhalten des Arbeitnehmers in Bezug auf die Geschäfte oder Angelegenheiten der Gesellschaft und/oder der MHT USA mit wesentlichen negativen Auswirkungen auf den Betrieb oder den Ruf der Gesellschaft und/oder der MHT USA. Im Falle einer vorstehend genannten Kündigung aus wichtigem Grund ist die Gesellschaft verpflichtet, dem Arbeitnehmer bis zum dem Tag, an dem die Kündigung wirksam wird (einschließlich), das zu diesem Zeitpunkt vereinbarte Grundgehalt und die aufgelaufenen Zusatzleistungen zu zahlen sowie dem Arbeitnehmer diejenigen Auslagen zu erstatten, deren Erstattung der Arbeitnehmer verlangen kann. Für einen Zeitraum von sechs (6) Monaten nach Ausspruch einer solchen Kündigung durch die Gesellschaft hat der Arbeitnehmer Anspruch auf Zahlung der Verkaufsprovision. Eine Kündigung gemäß dieser Ziffer 5(c) führt nicht zu Ansprüchen des Arbeitnehmers auf Zahlung sonstiger Gehälter, Boni, Zusatzleistungen, Abfindungen sowie sonstiger Vergütungen.

(d)     *Durch den Arbeitnehmer aus wichtigem Grund.* Der Arbeitnehmer ist gleichermaßen berechtigt, diesen Vertrag unter Einhaltung einer Kündigungsfrist von zehn (10) Tagen durch schriftliche Mitteilung an den Arbeitgeber aus wichtigem Grund (dies wäre eine wesentliche Vertragsverletzung durch den Arbeitgeber) zu kündigen. Im Falle einer solchen Kündigung verliert die Gesellschaft ihre ausschließlichen Nutzungsrechte an den von dem Arbeitnehmer vorgeschlagenen oder von der Gesellschaft lizenzierten technischen Lösungen gemäß Ziffer 6, es sei denn, die Vertragsparteien treffen eine abweichende Vereinbarung.

(e)     *Durch die Gesellschaft ohne Grund.* Die Gesellschaft ist während der Laufzeit dieses Vertrages jederzeit berechtigt, diesen Vertrag und das Beschäftigungsverhältnis mit dem Arbeitnehmer ohne Grund zu kündigen. Die Gesellschaft hat eine Kündigungsfrist von neunzig (90) Tagen einzuhalten und die Kündigungserklärung bedarf der Schriftform. Eine Kündigung dieses Vertrages ohne Grund ist erstmals mit Wirkung zum dritten Jahrestag dieses Vertrages möglich. Im Falle einer Kündigung während der Laufzeit dieses Vertrages durch die Gesellschaft ohne Grund hat der Arbeitnehmer Anspruch auf eine Abfindungszahlung in Höhe eines Betrages, der dem dreifachen des zu diesem Zeitpunkt vereinbarten monatlichen Grundgehalts entspricht, vorausgesetzt, der Arbeitnehmer unterzeichnet eine Freistellung, mit der er seinen Verzicht auf sämtliche Ansprüche gegen die Gesellschaft erklärt, und diese Freistellung wird nicht widerrufen. Dieser Betrag ist in den unmittelbar auf die Kündigung folgenden drei (3) Monaten jeden Monat gemäß den Standard-Gehaltszahlungsverfahren der Gesellschaft zu zahlen; darüber hinausgehende Schadensersatzansprüche des Arbeitnehmers als Folge einer solchen Kündigung sind ausgeschlossen. Eine Kündigung gemäß dieser Ziffer 5(e) führt nicht zu Ansprüchen des Arbeitnehmers auf Zahlung sonstiger Gehälter, Boni, Zusatzleistungen, Abfindungen sowie sonstiger Vergütungen. Die Gesellschaft verliert jedoch sämtliche ausschließlichen Nutzungsrechte an den von dem Arbeitnehmer vorgeschlagenen technischen Lösungen sowie das Nutzungsrecht an den Geschützten Informationen des Arbeitnehmers, es sei denn, die Vertragsparteien treffen eine abweichende Vereinbarung.

*[Faxkopf]*

(f)      *Durch den Arbeitnehmer ohne Grund.* Der Arbeitnehmer ist während der Laufzeit dieses Vertrages jederzeit berechtigt, diesen Vertrag und das Beschäftigungsverhältnis mit dem Arbeitnehmer ohne Grund zu kündigen. Bei einer freiwilligen Kündigung des Beschäftigungsverhältnisses hat der Arbeitnehmer eine Kündigungsfrist von mindestens sechzig (60) Tagen einzuhalten und die Kündigung bedarf der Schriftform. Scheidet der Arbeitnehmer aus der Gesellschaft aus oder beendet er sein Beschäftigungsverhältnis anderweitig ohne Grund gemäß dieser Ziffer 5(f) ist die Gesellschaft verpflichtet, dem Arbeitnehmer bis zu dem Tag, an dem die Kündigung in Kraft tritt (einschließlich), das zu diesem Zeitpunkt vereinbarte Grundgehalt und die aufgelaufenen Zusatzleistungen zu zahlen sowie dem Arbeitnehmer diejenigen Auslagen zu erstatten, deren Erstattung der Arbeitnehmer verlangen kann.

Eine Kündigung gemäß dieser Ziffer 5(f) führt nicht zu Ansprüchen des Arbeitnehmers auf Zahlung weiterer Gehälter, Boni, Zusatzleistungen, Abfindungen sowie sonstiger Vergütungen.

(g)      Nach Ablauf von mindestens drei (3) Jahren nach Abschluss dieses Vertrages kann sich der Arbeitnehmer dazu entschließen, unter Einhaltung einer Mitteilungsfrist von mindestens sechs (6) Monaten als Teilzeit-Mitarbeiter mit einer Arbeitszeit von mindestens 50 % einer Vollzeitstelle für die Gesellschaft zu arbeiten. Die gewählte Teilzeitbeschäftigung stellt keinen Grund für die Kündigung des Arbeitsvertrages oder ein Ende der Verpflichtungen der Gesellschaft dar. Die Gesamtvergütung wird jedoch im Verhältnis zur Arbeitszeit reduziert. Die Verkaufsprovision wird ein Jahr nach der Entscheidung für eine Teilzeitbeschäftigung anteilig reduziert.

6.      Lizenz an der Technologie und den Geschützte Informationen des Arbeitnehmers. Der Arbeitnehmer ist Eigentümer bestimmter Ideen, die in der Kategorie „Eigene Ideen" auf Seite 3 des Anhangs A zu dem Vertrag über Arbeitnehmererfindungen (nachfolgend zusammen als die „Geschützten Informationen des Arbeitnehmers" bezeichnet) aufgeführt sind. Dieser Anhang A enthält auch bestimmte in der Vergangenheit an Dritte abgetretene oder übertragene Patente (siehe die in jenem Vertrag enthaltenen Kategorien „Abgetretene Patente" und „Angemeldete Patente").

(a)      Als Gegenleistung für den Erhalt der Verkaufsprovision gemäß Ziffer 3(b)(iv) dieses Vertrages räumt der Arbeitnehmer hiermit der Gesellschaft eine ausschließliche Lizenz zur Nutzung, Einarbeitung und Vermarktung sämtlicher gegenwärtig und in der Vergangenheit nicht abgetretenen Geschützten Informationen des Arbeitnehmers (d. h. die in der Kategorie „Eigene Ideen" auf Seite 3 des Anhangs A als nicht abgetreten bezeichneten Informationen) in die Produkte und Leistungen der Gesellschaft ein.

(b)      Die in Ziffer 5(a) eingeräumte Lizenz endet an dem Tag, an dem eine Kündigung dieses Vertrages gemäß Ziffer 5(a) (Tod), 5 (b) (Berufsunfähigkeit), 5(d) (Kündigung durch den Arbeitnehmer aus wichtigem Grund) oder 5(e) (Kündigung durch die Gesellschaft ohne Grund) wirksam wird.

(c)      Die in Ziffer 5(a) eingeräumt Lizenz endet jedoch nicht, sondern bleibt in dem rechtlich gestatteten Umfang vollumfänglich in der in Ziffer 6(a) beschriebenen unbeschränkten und ausschließlichen Form für einen unbefristeten Zeitraum auch als Gegenleistung für die Kündigung bestehen, wenn dieser Vertrag gemäß Ziffer 5(c) (Kündigung durch die Gesellschaft aus wichtigem Grund) oder 5(f) (Kündigung durch den Arbeitnehmer ohne Grund) gekündigt wird.

(d)      Bei Kündigung dieses Vertrages gemäß Ziffer 5(a) (Tod) oder 5(b) (Berufsunfähigkeit) steht der Gesellschaft ein Vortrittsrecht zum Abschluss einer fortlaufenden Lizenz zur Nutzung der Geschützten Informationen des Arbeitnehmers mit dem Arbeitnehmer oder dem persönlichen Vertreter der Erben des Arbeitnehmers zu. Die Bedingungen für diese Lizenz werden einvernehmlich zwischen der Gesellschaft und dem Arbeitnehmer oder dem persönlichen Vertreter der Erben des Arbeitnehmers vereinbart.

[*Faxkopf*]

7.  Rückgabe von Eigentum der Gesellschaft. Sämtliche Aufzeichnungen, Entwürfe, Patente, Geschäftspläne, Jahresabschlüsse, Anleitungen, Vermerke, Listen sowie sonstiges, dem Arbeitnehmer übergebenes oder von ihm von der oder für die Gesellschaft, eines ihrer Verbundenen Unternehmen oder eines Vertreters, Lieferanten oder Kunden zusammengestelltes Eigentum der Gesellschaft, das im Zusammenhang mit dem Geschäft der Gesellschaft oder eines ihrer Verbunden Unternehmen steht, sind und bleiben Eigentum der Gesellschaft oder des jeweiligen Verbundenen Unternehmens und unterstehen jederzeit dem Ermessen und der Kontrolle der Gesellschaft oder des jeweiligen Verbundenen Unternehmens. Gleichermaßen sind im Falle einer Kündigung des Beschäftigungsverhältnisses mit dem Arbeitnehmer und unabhängig von der Ursache oder den Gründen für eine solche Kündigung sämtliche Korrespondenz, sämtliche Berichte, Aufzeichnungen, Diagramme, Werbematerialien und ähnliche Daten, die sich auf das Geschäft, die Aktivitäten oder zukünftige Pläne der Gesellschaft oder eines ihrer Verbundenen Unternehmen beziehen, die von dem Arbeitnehmer zusammengestellt wurden oder sich in seinem Besitz befinden, von dem Arbeitnehmer unverzüglich auf entsprechendes Verlangen an die Gesellschaft oder das jeweilige Verbundene Unternehmen herauszugeben. Bei entsprechender Aufforderung durch den Arbeitnehmer ist die Gesellschaft verpflichtet, an dem Tag des Ablaufs der Lizenz gemäß vorstehender Ziffer 6 oder zu einem beliebigen späteren Zeitpunkt dem Arbeitnehmer sämtliche mit den Geschützten Informationen des Arbeitnehmers im Zusammenhang stehenden Unterlagen und Dokumentationen zurückzugeben.

8.  Abtretung; bindende Wirkung. Die Parteien erkennen an und vereinbaren, dass die in diesem Vertrag enthaltenen Versprechen, Bestimmungen und Absprachen einen persönlichen Arbeitsvertrag darstellen und dass die Rechte und Pflichten der Vertragsparteien nicht übertragen, verkauft, abgetreten, verpfändet oder lombardiert werden können. Davon ausgenommen ist jedoch das Recht der Gesellschaft, ihre Rechte und Pflichten aus diesem Vertrag im Falle eines Verkaufs des Geschäfts, einer Verschmelzung, einer Konsolidierung, eines Aktientauschs, eines Verkaufs im Wesentlichen sämtlicher Vermögenswerte der Gesellschaft sowie im Falle einer sonstigen Reorganisation oder einer Liquidation, Auflösung oder aus anderen Gründen abtreten oder übertragen zu können, unabhängig davon, ob die Gesellschaft die fortführende Einheit ist. Dies gilt jedoch unter der Vorraussetzung, dass die Rechte und Pflichten der Parteien aus diesem Vertrag durch diese Abtretung oder Übertragung im Übrigen nicht geändert oder ergänzt werden.

Dem Arbeitnehmer ist bekannt, dass er aufgrund seiner persönlichen Qualifikationen, seiner Erfahrung und seiner Fähigkeiten für eine Beschäftigung bei der Gesellschaft ausgesucht wurde. Der Arbeitnehmer ist nicht berechtigt, seine Verpflichtungen zur Erfüllung dieses Vertrages abzutreten, er ist jedoch mit der vorherigen schriftlichen Zustimmung der Gesellschaft, die nicht unbillig verweigert werden darf, zur Abtretung seiner verbleibenden Rechte an den Geschützten Informationen des Arbeitnehmers berechtigt. Dieser Vertrag ist für die Vertragsparteien und ihre jeweiligen Erben, Verwalter, persönlichen Vertreter, Nachfolger und Abtretungsempfänger bindend.

9.  Vollständige Vereinbarung. Dieser Vertrag, einschließlich des beigefügten Anhang A, ersetzt sämtliche bisher zwischen der Gesellschaft und dem Arbeitnehmer geschlossenen mündlichen und schriftlichen Vereinbarungen. Mit Ausnahme dieses Vertrages einschließlich Anhang A, der Abwerbeverbots- und Vertraulichkeitsvereinbarung und dem Vertrag über Arbeitnehmererfindungen hat der Arbeitnehmer mit der Gesellschaft, einem ihrer verbundenen Unternehmen oder einem der leitenden Angestellten, *Directors* oder Vertreter der Gesellschaft oder eines verbundenen Unternehmens über den Gegenstand dieses Vertrages keine mündlichen Abreden oder Vereinbarungen getroffen. Dieser schriftliche Vertrag stellt zusammen mit dem beigefügten Anhang A die endgültige, vollständige und ausschließliche Erklärung und Bekundung der Vereinbarung sowie der Bestimmungen dieses Vertrages zwischen der Gesellschaft und dem Arbeitnehmer dar, und dieser Vertrag kann durch vorherige oder zeitgleich geschlossene Vereinbarungen nicht geändert, konterkariert oder ergänzt werden. Dieser schriftliche Vertrag kann zu einem späteren Zeitpunkt nur durch ein von ordnungsgemäß bevollmächtigten Vertretern der Gesellschaft und des Arbeitnehmers unterzeichnetes Dokument geändert werden und ein Verzicht auf eine Bestimmung dieses Vertrages bedarf einer schriftlichen Erklärung der Partei, die auf den Vorteil der jeweiligen Bestimmung verzichtet.

*[Faxkopf]*

10. <u>Mitteilungen</u>. Sofern dieser Vertrag die Abgabe von Mitteilungen verlangt, sind diese schriftlich an die nachfolgenden Anschriften zu richten:

An die Gesellschaft: Mold & Hotrunner Technology AG
Dr.-Ruben-Rausing-Straße 7
65239 Hochheim am Main
z. Hd. Christoph Kückels

An den Arbeitnehmer: Herrn Witold Neter
62 Shadow Lake Trail
Newnan, Georgia 30265

An die vorstehenden Anschriften adressierte Mitteilungen gelten drei (3) Tage nach ihrer Aufgabe bei der nationalen Post als Einschreiben mit Rückschein oder am Tag ihres tatsächlichen Erhalts als zugegangen und wirksam. Jede Partei kann die für Mitteilungen angegebene Anschrift ändern, indem sie die jeweils andere Partei über eine solche Änderung gemäß dieser <u>Ziffer 10</u> informiert.

11.  <u>Salvatorische Klausel; Überschriften</u>. Sollte ein Teil dieses Vertrages als unwirksam oder undurchführbar erklärt werden, werden dadurch die Wirksamkeit und Durchführbarkeit der übrigen Teile dieses Vertrages nicht berührt. Sofern es angemessen und möglich ist, ist der mit dem für unwirksam oder undurchführbar erklärten Teil ausgedrückte Wille der Parteien zu berücksichtigen.

Die hierin enthaltenen Überschriften dienen lediglich zu Referenzzwecken und haben keine Auswirkungen auf die Beschreibung, Auslegung, Definition oder Beschränkung des Umfangs oder der Zielsetzung dieses Vertrages oder eines beliebigen Teils davon.

12.  <u>Anwendbares Recht; Gerichtsstand</u>. Dieser Vertrag unterliegt dem Recht des US-Bundesstaates Georgia und ist nach diesem Recht auszulegen, anzuwenden und durchzusetzen. Das internationale Privatrecht wird ausgeschlossen. Die Parteien vereinbaren, dass jede Klage und jedes Verfahren, die/das der Durchsetzung dieses Vertrages dient oder aus diesem Vertrag entsteht, vor die *State Courts* oder den *United States District Court* in Atlanta, Georgia, zu bringen ist. Die Parteien stimmen einer solchen Zuständigkeit zu, vereinbaren, dass der ordnungsgemäße Gerichtsstand bei diesen Gerichten liegt und verzichten auf ihr Widerspruchsrecht unter dem Prinzip des <u>Forum Non Conveniens</u> (*Unzuständigkeit des Gerichts*). Die in dieser Ziffer enthaltene Gerichtsstandsklausel ist nicht dahingehend auszulegen, dass die Rechte zur Durchsetzung einer Klage unter diesem Vertrag in einer anderen Gerichtsbarkeit ausgeschlossen werden.

13.  <u>Nach der Beendigung dieses Vertrages fortgeltende Bestimmungen</u>. Die Ziffern 3(b)(iv), 4, 5, 6 und 7 gelten auch nach der Beendigung dieses Vertrages in dem hierin geregelten Umfang fort.

14.  <u>Widersprüche zu anderen Vereinbarungen</u>. Sollte eine Bestimmung dieses Vertrages einer Bestimmung der Abwerbeverbots- und Vertraulichkeitsvereinbarung oder dem Vertrag über Arbeitnehmererfindungen widersprechen, haben die Bestimmungen dieses Vertrages Vorrang.

*[Faxkopf]*

15.     <u>Anwendbares Recht</u>.     Dieser Vertrag ist in allen Aspekten nach dem Recht des US-Bundesstaates Georgia auszulegen.

**GESELLSCHAFT:**

**MOLD & HOTRUNNER TECHNOLOGY AG**

_____     *[unleserliche Unterschrift]*     _____

**ARBEITNEHMER:**

_____     *[unleserliche Unterschrift]*     _____
**WITOLD NETER**

**SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| WITOLD NETER, | ) | |
| | ) | |
| Kläger | ) | |
| | ) | **ZIVILVERFAHREN** |
| gegen | ) | |
| | ) | **AKTENZEICHEN**_____ |
| MOLD & HOTRUNNER | ) | |
| TECHNOLOGY AG, | ) | |
| | ) | |
| Beklagte | ) | |

### BESTÄTIGUNG

Persönlich erschien vor der kraft Gesetzes zur Abnahme von Eiden befugten unterzeichnenden *Notary Public* **WITOLD NETER**, Kläger in dem oben genannten Verfahren, und erklärte, dass die behaupteten Tatsachen in der vorstehenden Schadensersatzklage in beglaubigter Form nach bestem Wissen und Gewissen wahrheitsgetreu dargelegt worden sind.

Am heutigen [*handschriftlich*]   28.   [*handschriftlich*]   Juli   2010.


_____[*unleserliche Unterschrift*]_____
**WITOLD NETER**

In meiner Gegenwart unterzeichnet und beglaubigt
am heutigen [*handschriftlich*]   28.   [*handschriftlich*]   Juli
2010


_____[*unleserliche Unterschrift*]_____
*Notary Public*                    [*Stempel: Brenda B. Taylor*
                                   *Notary Public*
                                   *Bestellung endet am 7. Mai 2011*
                                   *Cobb County, Georgia*]

*[Anm. d. Übers.: Gegenstand der Übersetzung waren lediglich die Seiten 1 bis 19 des Originals.]*

Die Richtigkeit und Vollständigkeit der Übersetzung wird beglaubigt.
Der in englischer Sprache abgefasste Ursprungstext lag im Original vor.

Frankfurt am Main, 11. November 2010



SECOND ORIGINAL
SERVICE COPY



## IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303

### SUMMONS

Case No.: 2010CV188970

WITOLD NETER _____  )
_____  )
_____  )
     **Plaintiff,**  )
        vs.  )
MOLD & HOTRUNNER TECHNOLOGY ___  )
AG _____  )
_____  )
     **Defendant**  )
_____  )

TO THE ABOVE NAMED DEFENDANT(S):

Your are hereby summoned and required to file with the Clerk of said Court and serve upon plaintiff's attorney, whose name and address is:

Jackson L. Culbreth, Esq.
Attorney at Law
115 Perimeter Center Place
Suite 900
Atlanta, Georgia  30346

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This ___30___ day of ___July___, 20 _10_

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court

By _____
            Deputy Clerk

To defendant upon whom this petition is served:

This copy of complaint and summons was served upon you _____, 20 _____

_____
            Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

**FILED IN OFFICE**

JUL 3 0 2010

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

WITOLD NETER,                          )
                                       )
       Plaintiff                   )
                                       )     CIVIL ACTION FILE
                                       )
    vs.                          )
                                       )     NUMBER _____
MOLD & HOTRUNNER                       )
TECHNOLOGY AG,                         )
                                       )
       Defendant.                  )

## VERIFIED COMPLAINT FOR DAMAGES

      **COMES NOW** the Plaintiff by and through his legal counsel of record and files this his

Complaint against the Defendant and shows the Court as follows:

1.

      Plaintiff is an individual residing in the State of Georgia and has previously entered into a

written agreement with the Defendant, Mold & Hotrunner Technology AG, with regard to

certain proprietary and intellectual property of the Plaintiff.

2.

      The Defendant Mold & Hotrunner Technology AG ("MHT"), a German company, has

submitted itself to the jurisdiction of this Court pursuant to the agreement by and between

Plaintiff and Defendant.

3.

      A true and correct copy of the agreement by and between Plaintiff and Defendant is

attached hereto as Exhibit "A", and by reference incorporated herein, which agreement is

hereinafter sometimes referred to as the "MHT Agreement".

- 1 -

4.

The Defendant is a German corporation and has engaged in activities in the State of Georgia, and has agreed, pursuant to the MHT Agreement that it is subject to the jurisdiction of this Court and may be served by second original pursuant to O.C.G.A. § 9-11-4(F)(3) and applicable statutes as referenced therein at its principal place of business in Germany.

5.

The Defendant has consented, pursuant to the terms of the MHT Agreement, to venue in this Court.

6.

Pursuant to the terms and conditions of the MHT Agreement, Defendant agreed to license, on certain terms and conditions, intellectual property created by Plaintiff to include patents registered in Plaintiff's name so long as Defendant abided by the terms of the MHT Agreement.

7.

Defendant breached the terms and conditions of the MHT Agreement by failing to make payment to the Plaintiff on a timely basis as required pursuant to the terms and conditions of the MHT Agreement.

8.

Plaintiff terminated the MHT Agreement for cause, as allowed pursuant to the terms and conditions of MHT Agreement.

9.

Subsequent to the termination of the MHT Agreement the Defendant remained liable for payment of commissions to the Plaintiff for the periods ending December 31, 2008 and June 30, 2009.

10.

Subsequent to the termination of MHT Agreement for cause due to the breach by Defendant, the Defendant made payment of the commission amounts due for the periods ending December 31, 2008 and June 30, 2009 and failed to make any further commission payments to Plaintiff.

11.

Subsequent to the termination of the MHT Agreement due to breach by Defendant, the Defendant continued to be liable and responsible for payment of the commissions to the Plaintiff for a period thereafter to run for three (3) years.

12.

Pursuant to the MHT Agreement, Defendant was to account to Plaintiff, for its total gross sales, at the end of each six month period of each calendar year, and remit to Plaintiff the sum of four tenths of one percent (0.4%) of all gross sales of Defendant which had occurred in the preceding six (6) month accounting period, with payment to be made within thirty (30) of said accounting.

13.

The Defendant has made no accounting to the Plaintiff for the period ending December 31, 2009 and has made no payment of the commission for use of Plaintiff's intellectual property for the period ending December 31, 2009.

- 3 -

14.

Pursuant to the terms and conditions of the MHT Agreement, Defendant was required to cease the use of all of the Plaintiff's intellectual property upon termination of the MHT Agreement for cause.

15.

Upon information and belief, Defendant continues to make use of and to avail itself of the intellectual property of the Plaintiff in violation of the terms and conditions of the MHT Agreement.

## COUNT ONE
### Retention And Use Of Confidential
### And Proprietary Information

16.

Plaintiff does hereby reassert and reallege the allegations set forth in Paragraphs 1 through 15 of his Complaint and incorporates said paragraphs by reference as if fully set forth herein.

17.

The Defendant is in possession, and has control over the proprietary and confidential information of the Plaintiff as described and set forth in the MHT Agreement, which it no longer has a right to use.

18.

The proprietary and confidential information of Plaintiff as described in the MHT Agreement is confidential, proprietary and valuable information belonging to the Plaintiff.

- 4 -

19.

The Plaintiff has demanded that the Defendant cease the use of his proprietary and confidential information which Defendant has refused to do.

20.

Unless the Defendant is required to cease all use of the Plaintiff's proprietary and confidential information Plaintiff will be irreparably harmed and has no adequate remedy at law.

## COUNT TWO
### Accounting

21.

Plaintiff does hereby reassert and reallege the allegations set forth in Paragraphs 1 through 20 of his Complaint and incorporates said paragraphs by reference as if fully set forth herein.

22.

The MHT Agreement requires an accounting be provided to Plaintiff for each six (6) month calendar period of each year in which a commission remains due to Plaintiff following the termination of the MHT Agreement for cause.

23.

The Defendant has failed and refused to deliver an accounting to the Plaintiff.

24.

Plaintiff is entitled to receive an accounting from the Defendant for all gross sales of the Defendant for the period ending December 31, 2009.

25.

The Plaintiff is entitled to receive future accountings from the Defendant for the six (6)

month periods ending June 30, 2010, December 31, 2010, June 30, 2011 and December 31, 2011

and June 30, 2012.

## COUNT THREE
### Payment of Commission

26.

Plaintiff does hereby reassert and reallege the allegations set forth in Paragraphs 1

through 25 of his Complaint and incorporates said paragraphs by reference as if fully set forth

herein.

27.

The Plaintiff is entitled to a commission of four tenths of one percent (0.4%) of the gross

sales of the Defendant for the use of his proprietary and confidential information for the period

ending December 31, 2009.

28.

The Plaintiff shall be entitled to a commission of four tenths of one percent (0.4%) going

forward on the gross sales of the Defendant through and including June 30, 2012.

**WHEREFORE**, Plaintiff prays that judgment be entered in his favor and against the

Defendant as follows:

      (a)    That the Defendant be compelled to provide an accounting for the gross

sales of the Defendant for the period ending December 31, 2009 and be further compelled

to provide an accounting of its gross sales for the periods in the future ending June 30,

2010, December 31, 2010, June 30, 2011 and December 31, 2011 and June 30, 2012;

- 6 -

(b)     Money damages in an amount equal to four tenths of one percent (0.4%)

of the gross sales of Defendant for the six (6) month period ended December 31, 2009

and each six month period thereafter concluding with the six month period of June 30,

2012; and

(c)     For such other and further relief as this Court deems just and proper.

This ___30___ day of ___July___, 2010.

Respectfully submitted,

Jackson L. Culbreth
Georgia Bar No. 200300

115 Perimeter Center Place
Suite 900
Atlanta, Georgia  30346
(678) 252-6300

Attorney for Plaintiff Witold Neter

- 7 -

# EXHIBIT "A"

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement"), dated as of **January 26, 2007**, is by and between **MOLD & HOTRUNNER TECHNOLOGY AG** ("Company") and **WITOLD NETER**, a resident of Georgia with a residence of 62 Shadow Lake Trail, Newnan, Georgia, USA 30265 (the "Employee").

### RECITALS:

WHEREAS, the Company and the Employee have previously entered into an employment agreement and an accompanying non-solicitation and confidentiality agreement as well as an employee invention agreement, all of them dated August 1, 2005, and

WHEREAS, both the Company and the Employee desire to enter into a new employment agreement whereby the Company shall engage and retain Employee as an employee of the Company in accordance with the terms of this Agreement, and Employee desires to accept such employment on such terms;

NOW, THEREFORE, in consideration of the mutual promises, terms, covenants and conditions set forth herein and the performance of each, it is hereby agreed as follows:

### AGREEMENTS:

1.   Termination of Prior Employment Agreement.   The Employment Agreement including the accompanying non-solicitation and confidentiality agreement (the "Non-Solicitation and Confidentiality Agreement") and the employee invention agreement (the "Employee Invention Agreement") by and between the Company and the Employee, all of them dated August 1, 2005. The Employment Agreement is hereby terminated and is null, void and of no further effect, while the Non-Solicitation and Confidentiality Agreement as well as the Employee Invention Agreement shall remain in effect as set forth in Paragraph 4 below.

2.   Employment and Duties.  (a) The Company hereby employs Employee as:

   (i)   Director for Technical Strategy;

   (ii)   a Chief Technical Officer for MHT USA, LLC., a wholly-owned subsidiary of the Company ("MHT USA"); and

   (iii)   in such other capacities as may be assigned by the Company.  Employee will report to the President of the Company or such other person with managerial responsibility for the operations of the Company.  The Employee shall devote the Employee's best efforts and all of the Employee's business time and attention to the business and affairs of the Company and MHT USA and shall diligently, faithfully and competently perform the Employee's duties and responsibilities hereunder.

## EXHIBIT "A"

Notwithstanding anything herein to the contrary, for MHT USA, the Employee shall have no authority, directly or indirectly, to approve, authorize or otherwise effect any of the actions set forth on Exhibit A attached hereto and made a part hereof without the specific approval of the Board, as and which such Exhibit A may be amended by the Board from time to time. Employee hereby accepts this employment upon the terms and conditions herein contained and agrees to devote Employee's time, attention and best efforts to promote and further the business of the Company.

(iv)    Employee shall faithfully adhere to, execute and fulfill policies established by the Company which do not violate the laws of the jurisdiction where performed.

(v)    Employee shall not, during the term of Employee's employment hereunder, be engaged in any business activity pursued for gain, profit or other pecuniary advantage if such activity interferes with Employee's duties and responsibilities hereunder. However, the foregoing limitations shall not be construed as prohibiting Employee from making personal investments in such form or manner as will neither require his services in the operation or affairs of the enterprises in which such investments are made nor violate the terms of Section 4 hereof.

(b)    Company Responsibilities. The Company is responsible for:

(i)    determining the necessity and using its diligent efforts, together with the Employee, to obtain all necessary work permits in all countries outside the United States of America (USA) where the Company may require the Employee to perform services; and

(ii)    not requiring that Employee relocate his permanent residence from Newnan, Georgia, USA where an optional work office can be organized; and

(iii)    using its diligent efforts, together with the Employee, to ensure that Employee does not spend more than 180 days outside the United States of America in performing his duties hereunder.

3.    Compensation. For all services rendered by Employee, the Company shall compensate Employee as follows:

(a)    *Base Salary.* Beginning on the term of this Agreement, the base salary payable to Employee shall be One Hundred Twenty Thousand USA Dollars and No Cents ($120,000.00) per year (the "Base Salary"), payable from MHT USA's payroll on a regular basis in accordance with applicable standard payroll procedures and subject to mandatory deductions and withholdings.

(b)    *Perquisites, Benefits and Other Compensation.* During the term of this employment hereunder, the Employee shall be entitled to receive additional benefits and compensation from the Company in such form and to such extent as specified below:

- 2 -

(i)     Reimbursement for all business travel and other out-of-pocket expenses reasonably incurred by Employee in the performance of his services pursuant to this Agreement. All reimbursable expenses shall be appropriately documented in reasonable detail by Employee upon submission of any request for reimbursement, and in a format and manner consistent with the Company's expense reporting policy.

(ii)    Six weeks of paid vacation per year, plus paid (USA) holidays on New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving, and Christmas. The Employee shall be entitled to up to two weeks of supplementary vacation per year without pay.

(iii)   The Company shall provide with a monthly stipend of $2,500 which the Employee hereby agrees to use toward the purchase of private medical insurance coverage [Options for health insurance coverage in both the US and Germany to be checked by MHT].

(iv)    The Company shall pay to the Employee in addition to Base Salary a sales commission of 0.4 % of all gross sales of the Company's products. The Company shall pay the commission twice a year in arrears of thirty (30) days after the end of each calendar half. The Company shall submit a sales report to the Employee. The Employee shall be entitled to annually receive, no later than one week after the financial statement of MHT AG for the respective financial year has become final and binding, a copy of an excerpt from such financial statement which contains the data required by the Employee to satisfactorily verify the correctness of the determination by the Company of the amount of the annual Commission paid or to be paid. The Commission will continue to be paid to the Employee, or his estate, until the third anniversary of the date on which the termination of this Agreement pursuant to Paragraphs 5(a) (death), 5(b) (disability), 5(d) (termination by Employee for cause) or 5(e) (termination by Company without cause) has become effective. In all other cases of termination, payment of the Commission shall end by the date the termination of this Agreement becomes effective (and in case of a termination becoming effective during a financial year be calculated on a *pro rata temporis* basis), except as set forth in paragraph 5(c).

4.      Non-Competition and Confidentiality Agreement and Employee Invention Agreement. Employee recognizes that the Company's willingness to enter into this Agreement and agreement to provide Employee with Confidential Information is based in material part on Employee's continual adherence to the provisions of the Non-Solicitation and Confidentiality Agreement and the Employee Invention Agreement previously executed as of the 1 day of August, 2005. which remain in effect, and that Employee's breach of the provisions of the Non-Solicitation and Confidentiality Agreement and/or the Employee Invention Agreement could materially damage the Company.

- 3 --

in case of termination by the Company without cause, the Non-Solicitation Covenant 4(b)(i)(ii) will be void as soon as the company discontinue paying base salary, monthly stipend and sales commission after termination of the employment. The Company and Employee have previously agreed that certain proprietary information developed by the Employee prior to entering into an Employment Agreement, would remain as exclusive property of Employee.

     5.     Term; Termination; Rights on Termination.  The term of this Agreement shall begin on January 26, 2007 and continue for a period of three years, i.e. until January 26, 2010. The aforementioned term shall automatically be extended for one additional year on January 26, of each year thereafter, i.e. beginning with January 26, 2010 (each anniversary being referred to as an "Anniversary"), unless either party notifies the other, in writing, on or before the thirtiest day prior to such Anniversary that he or it does not desire to renew the Agreement, in which event the Agreement will terminate on such subsequent Anniversary. The aforementioned notification shall have the legal consequences set forth in Paragraph 5(e) 3rd, 4th, and 5th sentence. Paragraph 3(b)(iv) (last sentence but one) and Paragraph 5(b), if such notice is made by the Company. If the aforementioned notification is made by the Employee, it shall have the legal consequences set forth in Paragraph 5(f) 3rd and 4th sentence. Paragraph 3(b)(iv) (last sentence) and Paragraph 6(c).

     This Agreement and Employee's employment may – with any such legal consequences as set forth in this Paragraph 5 and in Paragraph 6 below – also be terminated in any one of the following ways:

     (a)     Death.  The death of the Employee shall immediately terminate this Agreement with no severance compensation due to Employee's estate. However, the commission due to Employee pursuant to Paragraph 3(b)(iv) will be paid to Employee's estate.

     (b)     Disability.  If, as a result of incapacity due to physical or mental illness or injury, Employee shall have been absent from full-time duties hereunder for three consecutive months, and is unable to perform the essential functions of his position, with or without reasonable accommodations, then 30 days after receiving written notice (which notice may occur before or after the end of such three-month period, but which shall not be effective earlier than the last day of such three (3) months period plus thirty (30) days), the Company may terminate Employee's employment hereunder provided Employee is unable to resume full-time duties at the conclusion of such notice period. Also, Employee may terminate his employment hereunder if his health should become impaired to an extent that makes the continued full performance of his duties hereunder hazardous to his physical or mental health or Employee's life, provided that Employee shall have furnished the Company with a written statement from a qualified doctor to such effect and provided, further, that, at the Company's request made within 30 days of the date of such written statement, Employee shall submit to an examination by a doctor selected by the Company who is reasonably acceptable to Employee or Employee's doctor and such Company doctor shall have concurred in the conclusion of Employee's doctor.

- 2 -

Jun 25 09 09:23p        World Meter                    770-202-0403              p.6

If this Agreement is terminated as a result of Employee's disability, Employee shall receive from the Company. upon signing and not revoking a complete release of all claims in favor of the Company, severance equal to six months' Base Salary, at the rate then in effect. payable each month during the six months period immediately following termination in accordance with the Company's standard payroll procedures and Employee shall not be entitled to any other damages as a result of such termination. Provided, however the waiver or claims shall not include the commission set forth in Paragraph 3(b)(iv).

(c)   *By Company For Cause.*  The Company may terminate this Agreement 10 days after written notice to Employee for cause, "cause" shall be defined for purposes of this Agreement as: (i) Employee's material breach of this Agreement; (ii) Employee's dishonesty, fraud or misconduct with respect to the business or affairs of the Company and/or MHT USA which materially and adversely affects the operations or reputation of the Company and/or MHT USA. In the event of a termination for cause, as enumerated above, the Company shall pay to the Employee his then current Base Salary and benefits accrued, and any expenses for which the Employee is entitled to be reimbursed, up to and including the effective date of such termination. The employee shall be entitled to payment of sales commission for a period of six months after such a termination has been declared by the company. The Employee shall not be entitled to any other salary, bonus, benefits, severance or other compensation as a result of termination pursuant to this Paragraph 5(c).

(d)   *By Employee For Cause.*  Similarly, Employee may terminate this Agreement ten (10) days after written notice to Employer for cause, which shall be Employer's material breach of this Agreement. In the event of this termination, the Company will loose the exclusive rights to use any technical solutions proposed by Employee or licensed to the Company as set forth in § 6 unless agreed otherwise between the parties to this Agreement.

(e)   *By Company Without Cause.*  At any time during the Term, the Company may, without cause, terminate this Agreement and Employee's employment. The Company shall provide Employee not less than 90 days advance written notice of any such termination and the first date of effectiveness of such termination without cause shall be the third anniversary of the date hereof. Should Employee be terminated by the Company without cause during the Term, Employee shall receive from the Company, upon signing and not revoking a release of all claims against the Company, severance equal to the sum of three months' Base Salary at the rate then in effect payable each month during the three months' period immediately following termination in accordance with the Company's standard payroll procedures and shall not be entitled to any other damages as a result of such termination. The Employee shall not be entitled to any other salary, bonus, benefits, severance or other compensation as a result of termination pursuant to this Paragraph 5(e). The Company will, however, loose exclusive rights to use any technical solutions proposed by Employee and the right to use any Employee Proprietary Information unless agreed otherwise between the parties to this Agreement.

- 5 -

(f)     *By Employee Without Cause.* At any time during the Term, the Employee may, without cause, terminate this Agreement and Employee's employment. The Employee shall provide the Company at least 60 days advance written notice of a voluntary termination of employment. If Employee resigns or otherwise terminates his employment without cause pursuant to this Section 5(f), the Company shall pay to the Employee his then current Base Salary and benefits accrued, and any expenses for which the Employee is entitled to be reimbursed, up to and including the effective date of such termination.

The Employee shall not be entitled to any other salary, bonus, benefits, severance or other compensation as a result of termination pursuant to this Paragraph 5(f).

(g)     After at least 3 years from the date of this agreement, employee may elect (with minimum 6 months prior notice) to work for the Company as part time employee with not less than 50% of the regular working hours. This elected part time employment will not be used as a base for termination of the employment agreement or any Company obligations. However, total compensation will be reduced proportionally to the working time. Sales commission will be reduced proportionally after one year after election of part time.

6.      License of Employee's Technology and Proprietary Information. The Employee is the owner of certain ideas, which are set forth in the category "Conceived Ideas" on page 3 on Exhibit A to the Employee Invention Agreement (hereinafter collectively referred to as the "Employee Proprietary Information"). Such Exhibit A also includes certain patents previously assigned or transferred to others, (see categories "Assigned Patents" and "Pending Patents" therein).

(a)     Employee, in consideration of the receipt of the sales commission set forth in Paragraph 3(b)(iv) herein, does hereby grant to the Company an exclusive license to use, incorporate and market in its products and services all current and previously unassigned Employee Proprietary Information (i.e. those mentioned, and declared as unassigned, in the category "Conceived Ideas" on page 3 of Exhibit A to the Employee Invention Agreement).

(b)     The license granted in Paragraph 5(a) shall expire upon the effectiveness of a termination of this Agreement pursuant to Paragraphs 5(a) (death), 5(b) disability, 5(d) (termination by Employee for cause) or 5(e) (termination by Company without cause).

(c)     The license granted in Paragraph 5(a) shall, however, not expire, but, to the extent legally permissible, continue to remain in full effect in such unlimited and exclusive form as described in Paragraph 6(a) for an indefinite period of time in case of, and in consideration for, the termination of this Agreement pursuant to Paragraphs 5(c) (termination by Company for cause) or 5(f) (termination by Employee without cause)..

(d)     Upon termination of this Agreement pursuant to Paragraphs 5(a) (death) or 5(b) (disability) the Company shall have the first right to enter into a continuing license for the use of the Employee Proprietary Information with the Employee or the personal representative of the Employee's estate, on terms and conditions mutually acceptable to the Company and the Employee or the personal representative of Employee's estate.

- 6 -

7.   Return of Company Property.   All records, designs, patents, business plans, financial statements, manuals, memoranda, lists and other property delivered to or compiled by Employee by or on behalf of the Company or any of its Affiliates or the representatives, vendors or customers thereof that pertain to the business of the Company or any of its Affiliates shall be and remain the property of the Company or such Affiliates, as the case may be, and be subject at all times to the discretion and control thereof.   Likewise, all correspondence, reports, records, charts, advertising materials and other similar data pertaining to the business, activities or future plans of the Company or any Affiliate of the Company that are collected or held by Employee shall be delivered promptly to the Company or such Affiliate, as the case may be, without request by such party, upon termination of Employee's employment, without regard to the cause or reasons for such termination.   Upon the request by Employee, on the date of expiration of the license pursuant to Paragraph 6 above or at any time thereafter, the Company shall return to the Employee all documents and documentation relating to Employee Proprietary Information.

8.   Assignment; Binding Effect.   The parties acknowledge and agree that the covenants, terms and provisions contained in this Agreement constitute a personal employment contract and the rights and obligations of the parties hereunder cannot be transferred, sold, assigned, pledged or hypothecated, except that the rights and obligations of the Company under this Agreement may be assigned or transferred pursuant to a sale of the business, merger, consolidation, share exchange, sale of substantially all of the Company's assets, or other reorganization, or through liquidation, dissolution or otherwise, whether or not the Company is the continuing entity, provided, however, that such assignment or transfer shall in any event not otherwise change or amend the rights and obligation of the parties hereunder.

Employee understands that Employee has been selected for employment by the Company on the basis of his personal qualifications, experience and skills and the Employee may not assign his performance obligations hereunder, but may assign any residual rights to the Employee Proprietary Information with the Company's prior written consent which consent shall not be unreasonably withheld.   This Agreement is binding on the parties hereto and their respective heirs, administrators, personal representatives, successors and assigns.

9.   Complete Agreement.   This Agreement including Exhibit A attached hereto supersedes all prior oral or written agreements by and between the Company and Employee. Other than this Agreement including Exhibit A attached hereto and the Non-Solicitation and Confidentiality Agreement and the Employee Invention Agreement, Employee has no oral understandings or agreements with the Company or any of its affiliated entities, or any of the Company's or any affiliate's officers, directors or representatives covering the same subject matter as this Agreement.   This written Agreement including Exhibit A attached hereto is the final, complete and exclusive statement and expression of the agreement between the Company and Employee and of all the terms of this Agreement, and it cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements.   This written Agreement may not be later modified except by a further writing signed by a duly authorized officer of the Company and Employee, and no term of this Agreement may be waived except by writing signed by the party waiving the benefit of such term.

- 7 -

770-252-8450                p.6

Jun. 25. 09. 09:25a     Witold Neter

10.    Notice.  Whenever any notice is required hereunder it shall be given in writing addressed as follows:

If to the Company:     Mold & Hotrunner Technology AG
                       Dr. Ruben Rausing Strasse 7
                       Hochheim am Main D 65239
                       Attn: Christoph Kückels


If to the Employee:    Mr. Witold Neter
                       62 Shadow Lake Trail
                       Newnan, Georgia 30265


Notice shall be deemed given and effective three days after the deposit in the national mail of a writing addressed as above and sent first class mail, certified, return receipt requested, or when actually received. Either party may change the address for notice by notifying the other party of such change in accordance with this Section 10.

11.    Severability; Headings.  If any portion of this Agreement is held invalid or inoperative, the other portions of this Agreement shall be deemed valid and operative and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion held invalid or inoperative.

The Section headings herein are for reference purposes only and are not intended in any way to describe, interpret, define or limit the extent or intent of the Agreement or any part hereof.

12.    Governing Law; Venue.  This Agreement shall be covered by, construed, applied and reinforced in accordance with the internal laws of the State of Georgia, without regard to conflicts of law provisions. The parties agree that any action or proceeding to enforce or arising out of this Agreement shall be commenced in the state courts, or in the United States District Court in Atlanta, Georgia. The parties consent to such jurisdiction, agree that venue will be proper in such courts and waive any objections based upon Forum Non Conveniens. The choice of forum set forth in this section shall not be deemed to preclude the enforcement of any action under this Agreement in any other jurisdiction.

13.    Provisions Which Survive the Termination of this Agreement.  Paragraphs 3(b)(iv), 4, 5, 6 and 7 shall survive the termination of this Agreement to the extent set forth therein.

14.    Conflict with Other Agreements.  To the extent that any of the provisions of this Agreement shall conflict with the terms and conditions of the Non-Solicitation and Confidentiality Agreement or the Employee Invention Agreement, the terms and conditions of this Agreement shall control

- 8 -

Jun 25 09 08:26p        Witold Neter

15.    <u>Governing Law</u>.  This Agreement shall in all respects be construed according to the laws of the State of Georgia.

COMPANY

MOLD & HOTRUNNER TECHNOLOGY AG

_____

EMPLOYEE:

_____

WITOLD NETER

- 9 -

**SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

WITOLD NETER,                          )
                                       )
          Plaintiff                    )         **CIVIL ACTION FILE**
                                       )
     vs.                               )         **NUMBER** _____
                                       )
MOLD & HOTRUNNER                       )
TECHNOLOGY AG,                         )
                                       )
          Defendant.                   )

## VERIFICATON

Personally appeared before the undersigned officer duly authorized by law to administer oaths, **WITOLD NETER**, named Plaintiff in the above-referenced case, and stated that the facts alleged in the foregoing Verified Complaint for Damages are true and correct to the best of his knowledge and belief.

This __28__ day of __July__, 2010.

_____
**WITOLD NETER**

Sworn to and subscribed before me
this __28th__ day of __July__
2010

_____
Notary Public

## SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

WITOLD NETER,                           )
                                        )
      Kläger                        )          ZIVILVERFAHREN
                                        )
      gegen                         )          AKTENZEICHEN_____
                                        )
MOLD & HOTRUNNER                        )
TECHNOLOGY AG,                          )
                                        )
      Beklagte.                     )

### VERIFICATON

Persönlich erschien vor dem von Gesetzes wegen zur Eidesabnahme befugten unterzeichnenden Beamten, **WITOLD NETER**, Kläger im obig benannten Verfahren, und erklärt, dass die behaupteten Tatsachen in zugrundeliegender beeidigter Schadensersatzklage wahrheitsgetreu und korrekt nach bestem Wissen und Gewissen dargelegt worden sind.

Am heutigen Tag _____ des _____, 2010.

_____
**WITOLD NETER**

Eidesabnahme und Unterzeichnung in meiner Gegenwart
Am heutigen Tag _____ des _____,
2010

_____
Notar

**Verification Document Witold Neter vs. Mold & Hotrunner Technology AG**

I hereby affirm that the Verification Document of Witold Neter vs. Mold & Hotrunner Technology AG, dated July 28, 2010, sworn to and subscribed by Witold Neter before Notary Brenda B. Taylor has been translated from English into German accurately to the best of my knowledge.

Andrea Morrison

08 - 04 - 2010

Date

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of Contra Costa

On _Contra Costa_ _____, before me, _Sandra R. Jones_ _____

Notary Public, personally appeared _Andrea Marrion_ _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose names(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

```
SANDRA R. JONES
COMM. # 1859568
NOTARY PUBLIC - CALIFORNIA
CONTRA COSTA COUNTY
MY COMM. EXP. JUL. 31, 2013
```

(Notary Seal)

_____
Signature of Notary Public

## OPTIONAL INFORMATION

The information below is not required by law, but it may prove to be important to persons relying on the document and could prevent fraudulent removal and reattachment of this form to some other document.

**DESCRIPTION OF ATTACHED DOCUMENT**

TITLE OR TYPE OF DOCUMENT: _Verification Documentation_

DOCUMENT DATE: _8-4-10_ _____  NUMBER OF PAGES _____

SIGNER (S) OTHER THAN NAMED ABOVE: _____

**CAPACITY (IES) CLAIMED BY SIGNER (S)**

| SIGNER'S NAME: _____ | SIGNER'S NAME: _____ |
|---|---|
| ___ INDIVIDUAL | ___ INDIVIDUAL |
| ___ CORPORATE OFFICER | ___ CORPORATE OFFICER |
| ___ TITLE (S): _____ | ___ TITLE (S): _____ |
| ___ PARTNER ___ LIMITED ___ GENERAL | ___ PARTNER ___ LIMITED ___ GENERAL |
| ___ ATTORNEY-IN-FACT | ___ ATTORNEY-IN-FACT |
| ___ TRUSTEE | ___ TRUSTEE |
| ___ GUARDIAN OR CONSERVATOR | ___ GUARDIAN OR CONSERVATOR |
| ___ OTHER: _____ | ___ OTHER: _____ |
| SIGNER IS REPRESENTING: | SIGNER IS REPRESENTING: |
| _____ | _____ |
| RIGHT THUMBPRINT OF SIGNER | RIGHT THUMBPRINT OF SIGNER |